Alan KAHN, Samuel Pill, Irwin Pill, Rachel Pill and Charlotte Martin, Plaintiffs Below, Appellants,

v.

M & F WORLDWIDE CORP., Ronald O. Perelman, Barry F. Schwartz, William C. Bevins, Bruce Slovin, Charles T. Dawson, Stephen G. Taub, John M. Keane, Theo W. Folz, Philip E. Beekman, Martha L. Byorum, Viet D. Dinh, Paul M. Meister, Carl B. Webb and MacAndrews & Forbes Holdings, Inc., Defendants Below, Appellees.

No. 334, 2013.

Supreme Court of Delaware.

Submitted: Dec. 18, 2013.
Decided: March 14, 2014.

Carmella P. Keener, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware, Peter B. Andrews, Esquire, Nadeem Faruqi, Esquire, Beth A. Keller, Esquire, Faruqi & Faruqi, LLP, Wilmington, Delaware, Carl L. Stine, Esquire (argued) and Matthew Insley–Pruitt, Esquire, Wolf Popper LLP, New York, New York, and James S. Notis, Esquire and Kira German, Esquire, Gardy & Notis, LLP, New York, New York, for appellants.

William M. Lafferty, Esquire, and D. McKinley Measley, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and Tariq Mundiya, Esquire (argued), Todd G. Cosenza, Esquire and Christopher J. Miritello, Esquire, Willkie Farr & Gallagher LLP, New York, New York, for appellees, Paul M. Meister, Martha L. Byorum, Viet D. Dinh and Carl B. Webb.

Thomas J. Allingham, II, Esquire (argued), Christopher M. Foulds, Esquire, Joseph O. Larkin, Esquire, and Jessica L. Raatz, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, for appellees MacAndrews & Forbes Holdings, Inc., Ronald O. Perelman, Barry F. Schwartz, and William C. Bevins.

Stephen P. Lamb, Esquire and Meghan M. Dougherty, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware, for appellees M & F Worldwide Corp., Bruce Slovin, Charles T. Dawson, Stephen G. Taub, John M. Keane, Theo W. Folz, and Philip E. Beekman.

Before HOLLAND, BERGER, JACOBS and RIDGELY, Justices and JURDEN, Judge,[1] constituting the Court en Banc.

HOLLAND, Justice:

This is an appeal from a final judgment entered by the Court of Chancery in a proceeding that arises from a 2011 acquisition by MacAndrews & Forbes Holdings, Inc. ("M & F" or "MacAndrews & Forbes")—a 43% stockholder in M & F Worldwide Corp. ("MFW")—of the remaining common stock of MFW (the "Merger"). From the outset, M & F's proposal to take MFW private was made contingent upon two stockholder-protective procedural conditions. First, M & F required the Merger to be negotiated and approved by a special committee of independent MFW directors (the "Special Committee"). Second, M & F required that the Merger be approved by a majority of stockholders unaffiliated with M & F. The Merger closed in December 2011, after it was approved by a vote of 65.4% of MFW's minority stockholders.

The Appellants initially sought to enjoin the transaction. They withdrew their request for injunctive relief after taking expedited discovery, including several depositions. The Appellants then sought post-closing relief against M & F, Ronald O. Perelman, and MFW's directors (including the members of the Special Committee) for breach of fiduciary duty. Again, the Appellants were provided with extensive discovery. The Defendants then moved for

---

1. Sitting by designation pursuant to Del. Const. art. IV, § 12 and Supr. Ct. R. 2 and 4.

summary judgment, which the Court of Chancery granted.

### Court of Chancery Decision

The Court of Chancery found that the case presented a "novel question of law," specifically, "what standard of review should apply to a going private merger conditioned upfront by the controlling stockholder on approval by both a properly empowered, independent committee and an informed, uncoerced majority-of-the-minority vote." The Court of Chancery held that business judgment review, rather than entire fairness, should be applied to a very limited category of controller mergers. That category consisted of mergers where the controller voluntarily relinquishes its control—such that the negotiation and approval process replicate those that characterize a third-party merger.

The Court of Chancery held that, rather than entire fairness, the business judgment standard of review should apply "if, *but only if:* (i) the controller conditions the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee acts with care; (v) the minority vote is informed; and (vi) there is no coercion of the minority." [2]

The Court of Chancery found that those prerequisites were satisfied and that the Appellants had failed to raise any genuine issue of material fact indicating the contrary. The court then reviewed the Merger under the business judgment standard and granted summary judgment for the Defendants.

**2.** Emphasis by the Court of Chancery.

### Appellants' Arguments

The Appellants raise two main arguments on this appeal. First, they contend that the Court of Chancery erred in concluding that no material disputed facts existed regarding the conditions precedent to business judgment review. The Appellants submit that the record contains evidence showing that the Special Committee was not disinterested and independent, was not fully empowered, and was not effective. The Appellants also contend, as a legal matter, that the majority-of-the-minority provision did not afford MFW stockholders protection sufficient to displace entire fairness review.

Second, the Appellants submit that the Court of Chancery erred, as a matter of law, in holding that the business judgment standard applies to controller freeze-out mergers where the controller's proposal is conditioned on both Special Committee approval and a favorable majority-of-the-minority vote. Even if both procedural protections are adopted, the Appellants argue, entire fairness should be retained as the applicable standard of review.

### Defendants' Arguments

The Defendants argue that the judicial standard of review should be the business judgment rule, because the Merger was conditioned *ab initio* on two procedural protections that together operated to replicate an arm's-length merger: the employment of an active, unconflicted negotiating agent free to turn down the transaction; and a requirement that any transaction negotiated by that agent be approved by a majority of the disinterested stockholders. The Defendants argue that using and *establishing* pretrial that both protective conditions were extant renders a going private transaction analogous to that of a third-party arm's-length merger under

Section 251 of the Delaware General Corporation Law. That is, the Defendants submit that a Special Committee approval in a going private transaction is a proxy for board approval in a third-party transaction, and that the approval of the unaffiliated, noncontrolling stockholders replicates the approval of all the (potentially) adversely affected stockholders.

### FACTS

#### MFW and M & F

MFW is a holding company incorporated in Delaware. Before the Merger that is the subject of this dispute, MFW was 43.4% owned by MacAndrews & Forbes, which in turn is entirely owned by Ronald O. Perelman. MFW had four business segments. Three were owned through a holding company, Harland Clarke Holding Corporation ("HCHC"). They were the Harland Clarke Corporation ("Harland"), which printed bank checks; Harland Clarke Financial Solutions, which provided technology products and services to financial services companies; and Scantron Corporation, which manufactured scanning equipment used for educational and other purposes. The fourth segment, which was not part of HCHC, was Mafco Worldwide Corporation, a manufacturer of licorice flavorings.

The MFW board had thirteen members. They were: Ronald Perelman, Barry Schwartz, William Bevins, Bruce Slovin, Charles Dawson, Stephen Taub, John Keane, Theo Folz, Philip Beekman, Martha Byorum, Viet Dinh, Paul Meister, and Carl Webb. Perelman, Schwartz, and Bevins were officers of both MFW and MacAndrews & Forbes. Perelman was the Chairman of MFW and the Chairman and CEO of MacAndrews & Forbes; Schwartz was the President and CEO of MFW and

the Vice Chairman and Chief Administrative Officer of MacAndrews & Forbes; and Bevins was a Vice President at MacAndrews & Forbes.

#### The Taking MFW Private Proposal

In May 2011, Perelman began to explore the possibility of taking MFW private. At that time, MFW's stock price traded in the $20 to $24 per share range. MacAndrews & Forbes engaged a bank, Moelis & Company, to advise it. After preparing valuations based on projections that had been supplied to lenders by MFW in April and May 2011, Moelis valued MFW at between $10 and $32 a share.

On June 10, 2011, MFW's shares closed on the New York Stock Exchange at $16.96. The next business day, June 13, 2011, Schwartz sent a letter proposal ("Proposal") to the MFW board to buy the remaining MFW shares for $24 in cash. The Proposal stated, in relevant part:

> The proposed transaction would be subject to the approval of the Board of Directors of the Company [*i.e.*, MFW] and the negotiation and execution of mutually acceptable definitive transaction documents. It is our expectation that the Board of Directors will appoint a special committee of independent directors to consider our proposal and make a recommendation to the Board of Directors. *We will not move forward with the transaction unless it is approved by such a special committee. In addition, the transaction will be subject to a non-waivable condition requiring the approval of a majority of the shares of the Company not owned by M & F or its affiliates ....*[3]

> ... In considering this proposal, you should know that in our capacity as a stockholder of the Company we are in-

3. Emphasis added.

terested only in acquiring the shares of the Company not already owned by us and that in such capacity we have no interest in selling any of the shares owned by us in the Company nor would we expect, in our capacity as a stockholder, to vote in favor of any alternative sale, merger or similar transaction involving the Company. If the special committee does not recommend or the public stockholders of the Company do not approve the proposed transaction, such determination would not adversely affect our future relationship with the Company and we would intend to remain as a long-term stockholder.

. . . .

In connection with this proposal, we have engaged Moelis & Company as our financial advisor and Skadden, Arps, Slate, Meagher & Flom LLP as our legal advisor, and we encourage the special committee to retain its own legal and financial advisors to assist it in its review.

MacAndrews & Forbes filed this letter with the U.S. Securities and Exchange Commission ("SEC") and issued a press release disclosing substantially the same information.

### The Special Committee Is Formed

The MFW board met the following day to consider the Proposal. At the meeting, Schwartz presented the offer on behalf of MacAndrews & Forbes. Subsequently, Schwartz and Bevins, as the two directors present who were also directors of MacAndrews & Forbes, recused themselves from the meeting, as did Dawson, the CEO of HCHC, who had previously expressed support for the proposed offer.

The independent directors then invited counsel from Willkie Farr & Gallagher—a law firm that had recently represented a Special Committee of MFW's independent directors in a potential acquisition of a subsidiary of MacAndrews & Forbes—to join the meeting. The independent directors decided to form the Special Committee, and resolved further that:

[T]he Special Committee is empowered to: (i) make such investigation of the Proposal as the Special Committee deems appropriate; (ii) evaluate the terms of the Proposal; (iii) negotiate with Holdings [i.e., MacAndrews & Forbes] and its representatives any element of the Proposal; (iv) negotiate the terms of any definitive agreement with respect to the Proposal (it being understood that the execution thereof shall be subject to the approval of the Board); (v) report to the Board its recommendations and conclusions with respect to the Proposal, including a determination and *recommendation as to whether the Proposal is fair and in the best interests of the stockholders of the Company other than Holdings* and its affiliates and should be approved by the Board; and (vi) determine to elect not to pursue the Proposal. . . . [4]

. . . .

. . . [T]he Board shall not approve the Proposal without a prior favorable recommendation of the Special Committee. . . .

. . . [T]he Special Committee [is] empowered to retain and employ legal counsel, a financial advisor, and such other agents as the Special Committee shall deem necessary or desirable in connection with these matters. . . .

The Special Committee consisted of Byorum, Dinh, Meister (the chair), Slovin, and Webb. The following day, Slovin recused himself because, although the MFW

4. Emphasis added.

board had determined that he qualified as an independent director under the rules of the New York Stock Exchange, he had "some current relationships that could raise questions about his independence for purposes of serving on the Special Committee."

## ANALYSIS

### What Should Be The Review Standard?

Where a transaction involving self-dealing by a controlling stockholder is challenged, the applicable standard of judicial review is "entire fairness," with the defendants having the burden of persuasion.[5] In other words, the defendants bear the ultimate burden of proving that the transaction with the controlling stockholder was entirely fair to the minority stockholders. In *Kahn v. Lynch Communication Systems, Inc.,*[6] however, this Court held that in "entire fairness" cases, the defendants may shift the burden of persuasion to the plaintiff if either (1) they show that the transaction was approved by a well-functioning committee of independent directors; **or** (2) they show that the transaction was approved by an informed vote of a majority of the minority stockholders.[7]

This appeal presents a question of first impression: what should be the standard of review for a merger between a controlling stockholder and its subsidiary, where the merger is conditioned *ab initio* upon the approval of **both** an independent, adequately-empowered Special Committee that fulfills its duty of care, and the uncoerced, informed vote of a majority of the

minority stockholders. The question has never been put directly to this Court.

Almost two decades ago, in *Kahn v. Lynch,* we held that the approval by *either* a Special Committee *or* the majority of the noncontrolling stockholders of a merger with a buying controlling stockholder would shift the burden of proof under the entire fairness standard from the defendant to the plaintiff.[8] *Lynch* did not involve a merger conditioned by the controlling stockholder on both procedural protections. The Appellants submit, nonetheless, that statements in *Lynch* and its progeny could be (and were) read to suggest that even if both procedural protections were used, the standard of review would remain entire fairness. However, in *Lynch* and the other cases that Appellants cited, *Southern Peru* and *Kahn v. Tremont,* the controller did not give up its voting power by agreeing to a non-waivable majority-of-the-minority condition.[9] That is the vital distinction between those cases and this one. The question is what the legal consequence of that distinction should be in these circumstances.

The Court of Chancery held that the consequence should be that the business judgment standard of review will govern going private mergers with a controlling stockholder that are conditioned *ab initio* upon (1) the approval of an independent and fully-empowered Special Committee that fulfills its duty of care and (2) the uncoerced, informed vote of the majority of the minority stockholders.

---

**5.** *Kahn v. Tremont Corp.,* 694 A.2d 422, 428 (Del.1997); *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del.1983); *see also Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 937 (Del.1985).

**6.** *Kahn v. Lynch Comc'n Sys., Inc.,* 638 A.2d 1110 (Del.1994).

**7.** *See id.* at 1117 (citation omitted).

**8.** *Kahn v. Lynch Commc'n Sys. (Lynch I),* 638 A.2d 1110, 1117 (Del.1994).

**9.** *Id.; Ams. Mining Corp. v. Theriault,* 51 A.3d 1213, 1234 (Del.2012); *Kahn v. Tremont Corp.,* 694 A.2d 422, 428 (Del.1997).

The Court of Chancery rested its holding upon the premise that the common law equitable rule that best protects minority investors is one that encourages controlling stockholders to accord the minority both procedural protections. A transactional structure subject to both conditions differs fundamentally from a merger having only one of those protections, in that:

> By giving controlling stockholders the opportunity to have a going private transaction reviewed under the business judgment rule, a strong incentive is created to give minority stockholders much broader access to the transactional structure that is most likely to effectively protect their interests.... That structure, it is important to note, is critically different than a structure that uses only *one* of the procedural protections. The "or" structure does not replicate the protections of a third-party merger under the DGCL approval process, because it only requires that one, and not both, of the statutory requirements of director and stockholder approval be accomplished by impartial decisionmakers. The "both" structure, by contrast, replicates the arm's-length merger steps of the DGCL by "requir[ing] two independent approvals, which it is fair to say serve independent integrity-enforcing functions."[10]

Before the Court of Chancery, the Appellants acknowledged that "this transactional structure is the optimal one for minority shareholders." Before us, however, they argue that neither procedural protection is adequate to protect minority stockholders, because "possible ineptitude and timidity of directors" may undermine the special committee protection, and because majority-of-the-minority votes may be unduly influenced by arbitrageurs that have an institutional bias to approve virtually any transaction that offers a market premium, however insubstantial it may be. Therefore, the Appellants claim, these protections, even when combined, are not sufficient to justify "abandon[ing]" the entire fairness standard of review.

With regard to the Special Committee procedural protection, the Appellants' assertions regarding the MFW directors' inability to discharge their duties are not supported either by the record or by well-established principles of Delaware law. As the Court of Chancery correctly observed:

> Although it is possible that there are independent directors who have little regard for their duties or for being perceived by their company's stockholders (and the larger network of institutional investors) as being effective at protecting public stockholders, the court thinks they are likely to be exceptional, and certainly our Supreme Court's jurisprudence does not embrace such a skeptical view.

Regarding the majority-of-the-minority vote procedural protection, as the Court of Chancery noted, "plaintiffs themselves do not argue that minority stockholders will vote against a going private transaction because of fear of retribution." Instead, as the Court of Chancery summarized, the Appellants' argued as follows:

> [Plaintiffs] just believe that most investors like a premium and will tend to vote for a deal that delivers one and that many long-term investors will sell out when they can obtain most of the premium without waiting for the ultimate vote. But that argument is not one that suggests that the voting decision is not voluntary, it is simply an editorial about

---

**10.** *In re MFW Shareholders Litigation*, 67 A.3d 496, 528 (Del.Ch.2013) (citing *In re Cox* *Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 618 (Del.Ch.2005)).

the motives of investors and does not contradict the premise that a majority-of-the-minority condition gives minority investors a free and voluntary opportunity to decide what is fair for themselves.

### Business Judgment Review Standard Adopted

■ We hold that business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders. We so conclude for several reasons.

First, entire fairness is the highest standard of review in corporate law. It is applied in the controller merger context as a substitute for the dual statutory protections of disinterested board and stockholder approval, because both protections are potentially undermined by the influence of the controller. However, as this case establishes, that undermining influence does not exist in every controlled merger setting, regardless of the circumstances. The simultaneous deployment of the procedural protections employed here create a countervailing, offsetting influence of equal—if not greater—force. That is, where the controller irrevocably and publicly disables itself from using its control to dictate the outcome of the negotiations and the shareholder vote, the controlled merger then acquires the shareholder-protective characteristics of third-party, arm's-length mergers, which are reviewed under the business judgment standard.

Second, the dual procedural protection merger structure optimally protects the minority stockholders in controller buy-outs. As the Court of Chancery explained:

[W]hen these two protections are established up-front, a potent tool to extract good value for the minority is established. From inception, the controlling stockholder knows that it cannot bypass the special committee's ability to say no. And, the controlling stockholder knows it cannot dangle a majority-of-the-minority vote before the special committee late in the process as a deal-closer rather than having to make a price move.

Third, and as the Court of Chancery reasoned, applying the business judgment standard to the dual protection merger structure:

. . . is consistent with the central tradition of Delaware law, which defers to the informed decisions of impartial directors, especially when those decisions have been approved by the disinterested stockholders on full information and without coercion. Not only that, the adoption of this rule will be of benefit to minority stockholders because it will provide a strong incentive for controlling stockholders to accord minority investors the transactional structure that respected scholars believe will provide them the best protection, a structure where stockholders get the benefits of independent, empowered negotiating agents to **bargain for the best price and say no** if the agents believe the deal is not advisable for any proper reason, plus the critical ability to determine for themselves whether to accept any deal that their negotiating agents recommend to them. A transactional structure with both these protections is fundamentally different from one with only one protection.[11]

Fourth, the underlying purposes of the dual protection merger structure utilized

11. Emphasis added.

here and the entire fairness standard of review both converge and are fulfilled at the same critical point: **price.** Following *Weinberger v. UOP, Inc.,* this Court has consistently held that, although entire fairness review comprises the dual components of fair dealing and fair price, in a non-fraudulent transaction "price may be the preponderant consideration outweighing other features of the merger."[12] The dual protection merger structure requires two price-related pretrial determinations: first, that a fair price was achieved by an empowered, independent committee that acted with care;[13] and, second, that a fully-informed, uncoerced majority of the minority stockholders voted in favor of the price that was recommended by the independent committee.

### *The New Standard Summarized*

■ To summarize our holding, in controller buyouts, the business judgment standard of review will be applied *if and only if:* (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[14]

■ If a plaintiff that can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist, that complaint would state a claim for relief that would entitle the plaintiff to proceed and conduct discovery.[15] If, after discovery, triable issues of fact remain about whether either or both of the dual procedural protections were

---

**12.** *Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del.1983).

**13.** In *Americas Mining,* for example, it was not possible to make a pretrial determination that the independent committee had negotiated a fair price. After an entire fairness trial, the Court of Chancery held that the price was not fair. *See Ams. Mining Corp. v. Theriault,* 51 A.3d 1213, 1241–44 (Del.2012).

**14.** The Verified Consolidated Class Action Complaint would have survived a motion to dismiss under this new standard. First, the complaint alleged that Perelman's offer "value[d] the company at just four times" MFW's profits per share and "five times 2010 pre-tax cash flow," and that these ratios were "well below" those calculated for recent similar transactions. Second, the complaint alleged that the final Merger price was two dollars per share *lower* than the trading price only about two months earlier. Third, the complaint alleged particularized facts indicating that MFW's share price was depressed at the times of Perelman's offer and the Merger announcement due to short-term factors such as MFW's acquisition of other entities and Stan-

dard & Poor's downgrading of the United States' creditworthiness. Fourth, the complaint alleged that commentators viewed both Perelman's initial $24 per share offer and the final $25 per share Merger price as being surprisingly low. These allegations about the sufficiency of the price call into question the adequacy of the Special Committee's negotiations, thereby necessitating discovery on all of the new prerequisites to the application of the business judgment rule.

**15.** *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,* 27 A.3d 531, 536–37 (Del.2011). *See also Winshall v. Viacom Int'l, Inc.,* 76 A.3d 808 (Del.2013); *White v. Panic,* 783 A.2d 543, 549 n. 15 (Del.2001) (We have emphasized on several occasions that stockholder "[p]laintiffs may well have the 'tools at hand' to develop the necessary facts for pleading purposes," including the inspection of the corporation's books and records under Del. Code Ann. tit. 8, § 220. There is also a variety of public sources from which the details of corporate act actions may be discovered, including governmental agencies such as the U.S. Securities and Exchange Commission.).

established, or if established were effective, the case will proceed to a trial in which the court will conduct an entire fairness review.[16]

This approach is consistent with *Weinberger, Lynch* and their progeny. A controller that employs and/or establishes only one of these dual procedural protections would continue to receive burden-shifting within the entire fairness standard of review framework. Stated differently, unless *both* procedural protections for the minority stockholders are established *prior to trial,* the ultimate judicial scrutiny of controller buyouts will continue to be the entire fairness standard of review.[17]

Having articulated the circumstances that will enable a controlled merger to be reviewed under the business judgment standard, we next address whether those circumstances have been established as a matter of undisputed fact and law in this case.

### *Dual Protection Inquiry*

To reiterate, in this case, the controlling stockholder conditioned its offer upon the MFW Board agreeing, *ab initio,* to both procedural protections, *i.e.,* approval by a Special Committee and by a majority of the minority stockholders. For the combination of an effective committee process and majority-of-the-minority vote to qualify (jointly) for business judgment review,

each of these protections must be effective singly to warrant a burden shift.

We begin by reviewing the record relating to the independence, mandate, and process of the Special Committee. In *Kahn v. Tremont Corp.,* this Court held that "[t]o obtain the benefit of burden shifting, the controlling stockholder must do more than establish a perfunctory special committee of outside directors."[18]

▮ Rather, the special committee must "function in a manner which indicates that the controlling stockholder did not dictate the terms of the transaction and that the committee exercised real bargaining power 'at an arms-length.'"[19] As we have previously noted, deciding whether an independent committee was effective in negotiating a price is a process so fact-intensive and inextricably intertwined with the merits of an entire fairness review (fair dealing and fair price) that a pretrial determination of burden shifting is often impossible.[20] Here, however, the Defendants have successfully established a record of independent committee effectiveness and process that warranted a grant of summary judgment entitling them to a burden shift prior to trial.

We next analyze the efficacy of the majority-of-the-minority vote, and we conclude that it was fully informed and not coerced. That is, the Defendants also established a pretrial majority-of-the-minority vote record that constitutes an indepen-

16. *Ams. Mining Corp. v. Theriault,* 51 A.3d 1213, 1240–41 (Del.2012).

17. *Id.* at 1241.

18. *Kahn v. Tremont Corp.,* 694 A.2d 422, 429 (Del.1997) (citation omitted). *See Emerald Partners v. Berlin,* 726 A.2d 1215, 1222–23 (Del.1999) (describing that the special committee must exert "real bargaining power" in order for defendants to obtain a burden shift); *see also Beam v. Stewart,* 845 A.2d 1040, 1055

n. 45 (Del.2004) (citing *Kahn v. Tremont Corp.,* 694 A.2d 422, 429–30 (Del.1997)) (noting that the test articulated in *Tremont* requires a determination as to whether the committee members *"in fact"* functioned independently).

19. *Kahn v. Tremont Corp.,* 694 A.2d at 429 (citation omitted).

20. *Ams. Mining Corp. v. Theriault,* 51 A.3d 1213 (Del.2012).

dent and alternative basis for shifting the burden of persuasion to the Plaintiffs.

### The Special Committee Was Independent

The Appellants do not challenge the independence of the Special Committee's Chairman, Meister. They claim, however, that the three other Special Committee members—Webb, Dinh, and Byorum—were beholden to Perelman because of their prior business and/or social dealings with Perelman or Perelman-related entities.

■ The Appellants first challenge the independence of Webb. They urged that Webb and Perelman shared a "longstanding and lucrative business partnership" between 1983 and 2002 which included acquisitions of thrifts and financial institutions, and which led to a 2002 asset sale to Citibank in which Webb made "a significant amount of money." The Court of Chancery concluded, however, that the fact of Webb having engaged in business dealings with Perelman nine years earlier did not raise a triable fact issue regarding his ability to evaluate the Merger impartially.[21] We agree.

■ Second, the Appellants argued that there were triable issues of fact regarding Dinh's independence. The Appellants demonstrated that between 2009 and 2011, Dinh's law firm, Bancroft PLLC, advised M & F and Scientific Games (in which M & F owned a 37.6% stake), during which time the Bancroft firm earned $200,000 in fees. The record reflects that Bancroft's limited prior engagements, which were inactive by the time the Merger proposal was announced, were fully disclosed to the Special Committee soon after it was formed. The Court of Chancery found that the Appellants failed to proffer any evidence to show that compensation received by Dinh's law firm was material to Dinh, in the sense that it would have influenced his decisionmaking with respect to the M & F proposal.[22] The only evidence of record, the Court of Chancery concluded, was that these fees were "*de minimis*" and that the Appellants had offered no contrary evidence that would create a genuine issue of material fact.[23]

■ The Court of Chancery also found that the relationship between Dinh, a Georgetown University Law Center professor, and M & F's Barry Schwartz, who sits on the Georgetown Board of Visitors, did not create a triable issue of fact as to Dinh's independence. No record evidence suggested that Schwartz could exert influence on Dinh's position at Georgetown based on his recommendation regarding the Merger. Indeed, Dinh had earned tenure as a professor at Georgetown before he ever knew Schwartz.

■ The Appellants also argue that Schwartz's later invitation to Dinh to join

21. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051 (Del.2004) ("Allegations that [the controller] and the other directors ... developed business relationships before joining the board ... are insufficient, without more, to rebut the presumption of independence.").

22. *See In re Gaylord Container Corp. S'holder Litig.*, 753 A.2d 462, 465 n. 3 (Del.Ch.2000) (no issue of fact concerning director's independence where director's law firm "has, over the years, done some work" for the company because plaintiffs did not provide evidence showing that the director "had a material financial interest" in the representation).

23. *See* Ct. Ch. R. 56(e) ("An adverse party may not rest upon the mere allegations or denials in the adverse party's pleading, but the adverse party's response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

the board of directors of Revlon, Inc. "illustrates the ongoing personal relationship between Schwartz and Dinh." There is no record evidence that Dinh expected to be asked to join Revlon's board at the time he served on the Special Committee. Moreover, the Court of Chancery noted, Schwartz's invitation for Dinh to join the Revlon board of directors occurred months after the Merger was approved and did not raise a triable fact issue concerning Dinh's independence from Perelman. We uphold the Court of Chancery's findings relating to Dinh.

■ Third, the Appellants urge that issues of material fact permeate Byorum's independence and, specifically, that Byorum "had a business relationship with Perelman from 1991 to 1996 through her executive position at Citibank." The Court of Chancery concluded, however, the Appellants presented no evidence of the nature of Byorum's interactions with Perelman while she was at Citibank. Nor was there evidence that after 1996 Byorum had an ongoing economic relationship with Perelman that was material to her in any way. Byorum testified that any interactions she had with Perelman while she was at Citibank resulted from her role as a senior executive, because Perelman was a client of the bank at the time. Byorum also testified that she had no business relationship with Perelman between 1996 and 2007, when she joined the MFW Board.

The Appellants also contend that Byorum performed advisory work for Scientific Games in 2007 and 2008 as a senior managing director of Stephens Cori Capital Advisors ("Stephens Cori"). The Court of Chancery found, however, that the Appellants had adduced no evidence tending to establish that the $100,000 fee Stephens Cori received for that work was material to either Stephens Cori or to Byorum personally.[24] Stephens Cori's engagement for Scientific Games, which occurred years before the Merger was announced and the Special Committee was convened, was fully disclosed to the Special Committee, which concluded that "it was not material, and it would not represent a conflict."[25] We uphold the Court of Chancery's findings relating to Byorum as well.

■ To evaluate the parties' competing positions on the issue of director independence, the Court of Chancery applied well-established Delaware legal principles.[26] To show that a director is not independent, a plaintiff must demonstrate that the director is "beholden" to the controlling par-

24. The Court of Chancery observed that Stephens Cori's fee from the Scientific Games engagement was "only one tenth of the $1 million that Stephens Cori would have had to have received for Byroum not to be considered independent under NYSE rules."

25. Although the Appellants note that Stephens Cori did some follow-up work for Scientific Games in 2011, it is undisputed that work was also fully disclosed to the Special Committee, and that Stephens Cori did not receive any additional compensation as a result.

26. The record does not support the Appellants' contention that that the Court of Chancery "relied heavily" on New York Stock Exchange ("NYSE") rules in assessing the independence of the Special Committee,

and that the application of such rules "goes against longstanding Delaware precedent." The Court of Chancery explicitly acknowledged that directors' compliance with NYSE independence standards "does not mean that they are necessarily independent under [Delaware] law in particular circumstances." The record reflects that the Court of Chancery discussed NYSE standards on director independence for illustrative purposes. *See, e.g., In re J.P. Morgan Chase & Co. S'holder Litig.,* 906 A.2d 808, 823–24 (Del.Ch.2005). However, the Court of Chancery's factual and legal determinations regarding the Special Committee's independence were premised on settled Delaware law. *Id.* at 824.

ty "or so under [the controller's] influence that [the director's] discretion would be sterilized."[27] Bare allegations that directors are friendly with, travel in the same social circles as, or have past business relationships with the proponent of a transaction or the person they are investigating are not enough to rebut the presumption of independence.[28]

A plaintiff seeking to show that a director was not independent must satisfy a materiality standard. The court must conclude that the director in question had ties to the person whose proposal or actions he or she is evaluating that are sufficiently substantial that he or she could not objectively discharge his or her fiduciary duties.[29] Consistent with that predicate materiality requirement, the existence of some financial ties between the interested party and the director, without more, is not disqualifying. The inquiry must be whether, applying a subjective standard, those ties were *material*, in the sense that the alleged ties could have affected the impartiality of the individual director.[30]

The Appellants assert that the materiality of any economic relationships the Special Committee members may have had with Mr. Perelman "should not be decided on summary judgment." But Delaware courts have often decided director independence as a matter of law at the summary judgment stage.[31] In this case, the Court of Chancery noted, that despite receiving extensive discovery, the Appellants did "nothing ... to compare the actual circumstances of the [challenged directors] to the ties [they] contend affect their impartiality" and "fail[ed] to proffer any real evidence of their economic circumstances."

The Appellants could have, but elected not to, submit any Rule 56 affidavits, either factual or expert, in response to the Defendants' summary judgment motion. The Appellants argue that they were entitled to wait until trial to proffer evidence compromising the Special Committee's independence. That argument misapprehends how Rule 56 operates.[32] Court of Chancery Rule 56 states that "the adverse [non-moving] party's response, by affidavits or as otherwise provided in this rule,

**27.** *Rales v. Blasband,* 634 A.2d 927, 936 (Del. 1993) (citing *Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984)).

**28.** *Beam ex rel. Martha Stewart Living Omnimedia v. Stewart,* 845 A.2d 1040, 1051–52 (Del.2004).

**29.** *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1167 (Del.1995) ("[A] shareholder plaintiff [must] show the materiality of a director's self-interest to the ... director's independence....") (citation omitted); *see Brehm v. Eisner,* 746 A.2d 244, 259 n. 49 (Del.2000) ("The term 'material' is used in this context to mean relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking.").

**30.** *See Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156 (Del.1995) (adopting a subjective standard for determining an individual director's financial self-interest). *See also, Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 363 (Del.1993) (affirming Court of Chancery's re-

quirement that "a shareholder show ... the materiality of a director's self-interest to the given director's independence" as a "restatement of established Delaware law"); *see also, e.g., Grimes v. Donald,* 673 A.2d 1207, 1216 (Del.1996) (stating, in the context of demand futility, that a stockholder must show that "a majority of the board has a *material* financial or familial interest" (emphasis added and citation omitted)).

**31.** *See, e.g., In re Transkaryotic Therapies, Inc.,* 954 A.2d 346, 369–70 (Del.Ch.2008) (no issue of material fact concerning directors' alleged conflict of loyalty); *In re Gaylord Container Corp. S'holder Litig.,* 753 A.2d 462, 465 (Del. Ch.2000) (concluding that directors were independent on a motion for summary judgment).

**32.** *In re Gaylord Container Corp. S'holder Litig.,* 753 A.2d at 465 n. 3.

must set forth specific facts showing that there is a genuine issue for trial."[33]

The Court of Chancery found that to the extent the Appellants claimed the Special Committee members, Webb, Dinh, and Byorum, were beholden to Perelman based on prior economic relationships with him, the Appellants never developed or proffered evidence showing the materiality of those relationships:

> Despite receiving the chance for extensive discovery, the plaintiffs have done nothing ... to compare the actual economic circumstances of the directors they challenge to the ties the plaintiffs contend affect their impartiality. In other words, the plaintiffs have ignored a key teaching of our Supreme Court, requiring a showing that a specific director's independence is compromised by factors material to her. As to each of the specific directors the plaintiffs challenge, the plaintiffs fail to proffer any real evidence of their economic circumstances.

The record supports the Court of Chancery's holding that none of the Appellants' claims relating to Webb, Dinh or Byorum raised a triable issue of material fact concerning their individual independence or the Special Committee's collective independence.[34]

### The Special Committee Was Empowered

It is undisputed that the Special Committee was empowered to hire its own legal and financial advisors, and it retained Willkie Farr & Gallagher LLP as its legal advisor. After interviewing four potential financial advisors, the Special Committee engaged Evercore Partners ("Evercore"). The qualifications and independence of Evercore and Willkie Farr & Gallagher LLP are not contested.

Among the powers given the Special Committee in the board resolution was the authority to "report to the Board its recommendations and conclusions with respect to the [Merger], including a determination and recommendation as to whether the Proposal is fair and in the best interests of the stockholders...." The Court of Chancery also found that it was "undisputed that the [S]pecial [C]ommittee was empowered not simply to 'evaluate' the offer, like some special committees with weak mandates, but to negotiate with [M & F] over the terms of its offer to buy out the noncontrolling stockholders.[35] This negotiating power was accompanied by the clear authority to say no definitively to [M & F]" and to "make that decision stick." MacAndrews & Forbes promised that it would not proceed with any going private proposal that did not have the support of the Special Committee. Therefore, the Court of Chancery concluded, "the MFW committee did not have to fear that if it bargained too hard, MacAndrews & Forbes could bypass the committee and make a tender offer directly to the minority stockholders."

---

**33.** See also Burkhart v. Davies, 602 A.2d 56, 59 (Del.1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

**34.** See In re W. Nat'l Corp. S'holders Litig., 2000 WL 710192, at *6 (Del.Ch. May 22, 2000) (to survive summary judgment, nonmoving party "must affirmatively state facts— not guesses, innuendo, or unreasonable inferences....").

**35.** See, e.g., Ams. Mining Corp. v. Theriault, 51 A.3d 1213, 1244–46 (Del.2012) (noting that a special committee that could only "evaluate" an offer had a "narrow mandate"); Brinckerhoff v. Tex. E. Prods. Pipeline Co., LLC, 986 A.2d 370, 381 (Del.Ch.2010) (observing that a special committee should have the mandate to "review, evaluate, negotiate, and to recommend, or reject, a proposed merger").

The Court of Chancery acknowledged that even though the Special Committee had the authority to negotiate and "say no," it did not have the authority, as a practical matter, to sell MFW to other buyers. MacAndrews & Forbes stated in its announcement that it was not interested in selling its 43% stake. Moreover, under Delaware law, MacAndrews & Forbes had no duty to sell its block, which was large enough, again as a practical matter, to preclude any other buyer from succeeding unless MacAndrews & Forbes decided to become a seller. Absent such a decision, it was unlikely that any potentially interested party would incur the costs and risks of exploring a purchase of MFW.

Nevertheless, the Court of Chancery found, "this did not mean that the MFW Special Committee did not have the leeway to get advice from its financial advisor about the strategic options available to MFW, including the potential interest that other buyers might have *if MacAndrews & Forbes was willing to sell.*" [36] The undisputed record shows that the Special Committee, with the help of its financial advisor, did consider whether there were other buyers who might be interested in purchasing MFW, and whether there were other strategic options, such as asset divestitures, that might generate more value for minority stockholders than a sale of their stock to MacAndrews & Forbes.

### The Special Committee Exercised Due Care

The Special Committee insisted from the outset that MacAndrews (including any "dual" employees who worked for both MFW and MacAndrews) be screened off from the Special Committee's process, to ensure that the process replicated arm's-length negotiations with a third party. In order to carefully evaluate M & F's offer,

the Special Committee held a total of eight meetings during the summer of 2011.

From the outset of their work, the Special Committee and Evercore had projections that had been prepared by MFW's business segments in April and May 2011. Early in the process, Evercore and the Special Committee asked MFW management to produce new projections that reflected management's most up-to-date, and presumably most accurate, thinking. Consistent with the Special Committee's determination to conduct its analysis free of any MacAndrews influence, MacAndrews—including "dual" MFW/MacAndrews executives who normally vetted MFW projections—were excluded from the process of preparing the updated financial projections. Mafco, the licorice business, advised Evercore that all of its projections would remain the same. Harland Clarke updated its projections. On July 22, 2011, Evercore received new projections from HCHC, which incorporated the updated projections from Harland Clarke. Evercore then constructed a valuation model based upon all of these updated projections.

The updated projections, which formed the basis for Evercore's valuation analyses, reflected MFW's deteriorating results, especially in Harland's check-printing business. Those projections forecast EBITDA for MFW of $491 million in 2015, as opposed to $535 million under the original projections.

On August 10, Evercore produced a range of valuations for MFW, based on the updated projections, of $15 to $45 per share. Evercore valued MFW using a variety of accepted methods, including a discounted cash flow ("DCF") model. Those valuations generated a range of fair value of $22 to $38 per share, and a premiums

---

**36.** Emphasis added.

paid analysis resulted in a value range of $22 to $45. MacAndrews & Forbes's $24 offer fell within the range of values produced by each of Evercore's valuation techniques.

Although the $24 Proposal fell within the range of Evercore's fair values, the Special Committee directed Evercore to conduct additional analyses and explore strategic alternatives that might generate more value for MFW's stockholders than might a sale to MacAndrews. The Special Committee also investigated the possibility of other buyers, *e.g.*, private equity buyers, that might be interested in purchasing MFW. In addition, the Special Committee considered whether other strategic options, such as asset divestitures, could achieve superior value for MFW's stockholders. Mr. Meister testified, "The Committee made it very clear to Evercore that we were interested in any and all possible avenues of increasing value to the stockholders, including meaningful expressions of interest for meaningful pieces of the business."

█ The Appellants insist that the Special Committee had "no right to solicit alternative bids, conduct any sort of market check, or even consider alternative transactions." But the Special Committee did just that, even though MacAndrews' stated unwillingness to sell its MFW stake meant that the Special Committee did not have the practical ability to market MFW to other buyers. The Court of Chancery properly concluded that despite the Special Committee's inability to solicit alternative bids, it *could* seek Evercore's advice about strategic alternatives, including *values that might be available if MacAndrews was willing to sell.*

Although the MFW Special Committee considered options besides the M & F Proposal, the Committee's analysis of those alternatives proved they were un-

likely to achieve added value for MFW's stockholders. The Court of Chancery summarized the performance of the Special Committee as follows:

> [t]he special committee did consider, with the help of its financial advisor, whether there were other buyers who might be interested in purchasing MFW, and whether there were other strategic options, such as asset divestitures, that might generate more value for minority stockholders than a sale of their stock to MacAndrews & Forbes.

On August 18, 2011, the Special Committee rejected the $24 a share Proposal, and countered at $30 per share. The Special Committee characterized the $30 counteroffer as a negotiating position. The Special Committee recognized that $30 per share was a very aggressive counteroffer and, not surprisingly, was prepared to accept less.

On September 9, 2011, MacAndrews & Forbes rejected the $30 per share counteroffer. Its representative, Barry Schwartz, told the Special Committee Chair, Paul Meister, that the $24 per share Proposal was now far less favorable to MacAndrews & Forbes—but more attractive to the minority—than when it was first made, because of continued declines in MFW's businesses. Nonetheless, MacAndrews & Forbes would stand behind its $24 offer. Meister responded that he would not recommend the $24 per share Proposal to the Special Committee. Later, after having discussions with Perelman, Schwartz conveyed MacAndrews's "best and final" offer of $25 a share.

At a Special Committee meeting the next day, Evercore opined that the $25 per share *price was fair* based on generally accepted valuation methodologies, including DCF and comparable companies analyses. At its eighth and final meeting on

September 10, 2011, the Special Committee, although empowered to say "no," instead unanimously approved and agreed to recommend the Merger at a price of $25 per share.

Influencing the Special Committee's assessment and acceptance of M & F's $25 a share price were developments in both MFW's business and the broader United States economy during the summer of 2011. For example, during the negotiation process, the Special Committee learned of the underperformance of MFW's Global Scholar business unit. The Committee also considered macroeconomic events, including the downgrade of the United States' bond credit rating, and the ongoing turmoil in the financial markets, all of which created financing uncertainties.

■■■ In scrutinizing the Special Committee's execution of its broad mandate, the Court of Chancery determined there was no "evidence indicating that the independent members of the special committee did not meet their duty of care...." To the contrary, the Court of Chancery found, the Special Committee "met frequently and was presented with a rich body of financial information relevant to whether and at what *price* a going private transaction was advisable." The Court of Chancery ruled that "the plaintiffs d[id] not make any attempt to show that the MFW Special Committee failed to meet its duty of care...." Based on the undisputed record, the Court of Chancery held that, "there is no triable issue of fact regarding whether the [S]pecial [C]ommittee fulfilled its duty of care." In the context of a controlling stockholder merger, a pretrial determination that the *price* was negotiated by an empowered independent committee that acted with care would shift the burden of persuasion to the plaintiffs under the entire fairness standard of review.[37]

### Majority of Minority Stockholder Vote

We now consider the second procedural protection invoked by M & F—the majority-of-the-minority stockholder vote.[38] Consistent with the second condition imposed by M & F at the outset, the Merger was then put before MFW's stockholders for a vote. On November 18, 2011, the stockholders were provided with a proxy statement, which contained the history of the Special Committee's work and recommended that they vote in favor of the transaction at a price of $25 per share.

The proxy statement disclosed, among other things, that the Special Committee had countered M & F's initial $24 per share offer at $30 per share, but only was able to achieve a final offer of $25 per share. The proxy statement disclosed that the MFW business divisions had discussed with Evercore whether the initial projections Evercore received reflected management's latest thinking. It also disclosed that the updated projections were lower. The proxy statement also included the five separate price ranges for the value of MFW's stock that Evercore had generated with its different valuation analyses.

■■■ Knowing the proxy statement's disclosures of the background of the Special Committee's work, of Evercore's valuation ranges, and of the analyses support-

37. *Kahn v. Lynch Commc'n Sys. (Lynch I)*, 638 A.2d 1110, 1117 (Del.1994).

38. The MFW board discussed the Special Committee's recommendation to accept the $25 a share offer. The three directors affiliated with MacAndrews & Forbes, Perelman, Schwartz, and Bevins, and the CEOs of HCHC and Mafco, Dawson and Taub, recused themselves from the discussions. The remaining eight directors voted unanimously to recommend the $25 a share offer to the stockholders.

ing Evercore's *fairness opinion*, MFW's stockholders—representing more than 65% of the minority shares—approved the Merger. In the controlling stockholder merger context, it is settled Delaware law that an uncoerced, informed majority-of-the-minority vote, without any other procedural protection, is itself sufficient to shift the burden of persuasion to the plaintiff under the entire fairness standard of review.[39] The Court of Chancery found that "the plaintiffs themselves do not dispute that the majority-of-the-minority vote was fully informed and uncoerced, because they fail to allege any failure of disclosure or any act of coercion."

### Both Procedural Protections Established

■ Based on a highly extensive record,[40] the Court of Chancery concluded that the procedural protections upon which the Merger was conditioned—approval by an independent and empowered Special Committee and by a uncoerced informed majority of MFW's minority stockholders—had *both* been undisputedly established *prior to trial*. We agree and conclude the Defendants' motion for summary judgment was properly granted on all of those issues.

### Business Judgment Review Properly Applied

We have determined that the business judgment rule standard of review applies to this controlling stockholder buyout. Under that standard, the claims against the Defendants must be dismissed unless no rational person could have believed that the merger was favorable to MFW's minority stockholders.[41] In this case, it cannot be credibly argued (let alone concluded) that no rational person would find the Merger favorable to MFW's minority stockholders.

### Conclusion

For the above-stated reasons, the judgment of the Court of Chancery is affirmed.

---

**39.** *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del.1985).

**40.** The Appellants received more than 100,-000 pages of documents, and deposed all four Special Committee members, their financial advisors, and senior executives of MacAndrews and MFW. After eighteen months of discovery, the Court of Chancery found that the Appellants offered no evidence to create a triable issue of fact with regard to: (1) the Special Committee's independence; (2) the Special Committee's power to retain independent advisors and to say no definitively; (3) the Special Committee's due care in approving the Merger; (4) whether the majority-of-the-minority vote was fully informed; and (5) whether the minority vote was uncoerced.

**41.** *E.g., In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del.2006) ("[W]here business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be 'attributed to any rational business purpose.'" (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971))).