# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JOSEPH LAWRENCE LIGOS, <br><br> Plaintiff, <br><br> v. <br><br> ISRAMCO, INC., NAPHTHA ISRAEL PETROLEUM CORPORATION LTD., NAPHTHA HOLDING LTD., I.O.C. - ISRAEL OIL COMPANY, LTD., NAPHTHA US OIL, INC., HAIM TSUFF, ISRAMCO NEGEV 2 LIMITED PARTNERSHIP, JOSEPH FROM, MAX PRIDGEON, ASAF YARKONI, FRANS SLUITER, and NIR HASSON, <br><br> Defendants. | ) ) ) ) ) ) ) ) C.A. No. 2020-0435-SG ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## MEMORANDUM OPINION

Date Submitted: May 21, 2021
Date Decided: August 31, 2021

Corinne Elise Amato, Kevin H. Davenport, Samuel L. Closic, Stephen D. Dargitz, and Jason W. Rigby, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: Eric L. Zagar, J. Daniel Albert, Justin O. Reliford, and Christopher M. Windover, of KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania, *Attorneys for Joseph Lawrence Ligos.*

William B. Chandler III, Bradley D. Sorrels, Daniyal M. Iqbal, and Nora M. Crawford, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; OF COUNSEL: Steven Guggenheim, of WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California, *Attorneys for Defendants Max Pridgeon, Asaf Yarkoni, and Nir Hasson.*

S. Mark Hurd and Daniel T. Menken, of MORRIS NICHOLS ARSHT & TUNNEL, LLP, Wilmington, Delaware; OF COUNSEL: Danny David and Amy Pharr Hefley, of BAKER BOTTS L.L.P., Houston, Texas, *Attorneys for Defendants Haim Tsuff, Naphtha Israel Petroleum Corporation Ltd., Naphtha Holding Ltd., I.O.C. - Israel Oil Company, Ltd., Naphtha US Oil, Inc., and Isramco Negev 2 LP.*

Bradley R. Aronstam, Adam D. Gold, and Anthony M. Calvano, of ROSS ARONSTAM & MORITZ, Wilmington, *Attorneys for Defendants Joseph From, Frans Sluiter, and Isramco, Inc.*

**GLASSCOCK, Vice Chancellor**

Before me is a complaint by Joseph Ligos, a former stockholder of a Delaware corporation, Isramco, Inc. ("Isramco" or the "Company"), who was cashed out in a merger in 2019. According to Ligos, the merger was unfair. Because the Company was controlled, indirectly, through Defendant Haim Tsuff, and because Tsuff also indirectly controlled the acquiror, Defendant Naphtha Israel Petroleum Corp. ("Naphtha") and its affiliates, entire fairness review of the transaction is the default standard. Obviously, this is because of the agency problem created where a controller stands on both sides of the transaction.

Nonetheless, the common law of corporations recognizes that conflicted controller transactions may enhance firm value, and that the risk of litigation under the high bar of entire fairness may discourage such value-enhancing deals. Accordingly, the law has encouraged mechanisms to reduce the risk to the principals—the stockholders—in such transactions, culminating in *MFW* and its progeny.[1] Compliance with the *MFW* rubric allows conflicted transactions to receive business judgment review, but given the agency risk, compliance with the rubric is strictly construed. To avoid entire fairness review under *MFW*, the company and its controller must demonstrate compliance with two conditions: First, the deal must be subject ab initio to negotiation by a committee of independent and disinterested directors, fully empowered and in compliance with the duties of loyalty

---

[1] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

and care.  Second, the transaction must also be so subject to a "majority of the minority" stockholder vote in favor, by a fully informed and uncoerced electorate. If either of these conditions is absent, entire fairness review results.

Currently pending are numerous defendants' motions to dismiss under Rules 12(b)(6) and 12(b)(2).  This opinion addresses only Tsuff's motion to dismiss under Rule 12(b)(6), arguing that business judgment must apply because the transaction was fully compliant with the *MFW* standard.  For the following reasons, that motion must be denied; it will necessarily inform the other motions under 12(b)(6), however. The parties should inform me, in light of that finding, whether further briefing is appropriate, and I will then address the remainder of the motions to dismiss.

The Plaintiff raises a number of ways in which he finds that the procedure here fell short of that called for in *MFW*.  I need address only one to resolve the motions to dismiss.[2]  The *MFW* standard requires that the deal be conditioned on a majority of the minority vote by stockholders who are uncoerced *and fully informed*. Because I find that the record at this pleading stage, together with the Plaintiff-friendly inferences therefrom, makes it plausible that the vote was materially uninformed, entire fairness review is applicable, and dismissal under *MFW* is thus inappropriate.

---

[2] Left for another stage in the litigation is the question as to whether the burden of proof on entire fairness must shift to the Plaintiffs given the use of a special committee to negotiate the transaction.

The Complaint alleges that a material factor in arriving at a fair value of Isramco was the value of certain overriding royalties in an offshore Israeli oil field, the Tamar Field, in which another entity, Isramco Negev 2 Limited Partnership ("Negev 2") owns a working interest. The value of the royalties, in turn, was dependent on when the right to receive royalties ripened, a matter on which Isramco and Negev 2 disagree. The royalty issue was, at the time of the merger, in arbitration. Negev 2 is yet another entity controlled by Tsuff. The value of the royalties, and the value of the arbitration, were material to the deal price.

According to the merger proxy (the "Proxy"), some facts about the arbitration, and the value of the arbitration assigned by the Special Committee's financial advisor, were disclosed to the minority stockholders. Stockholders were told that Naphtha, the merger counterparty, held a controlling interest in Negev 2, which was involved in the arbitration. What they were not told is the following. About the time that Tsuff formed a desire for Naphtha to acquire Isramco, he approached the Isramco board of directors (the "Board") for permission to allow *Tsuff himself* to participate in the arbitration. The Board agreed. Under the motion to dismiss standard, I must assume that, having received permission of the Board to participate, Tsuff did so, and that he pursued his own, conflicted, self-interest in that arbitration. It is the Plaintiff's theory that Tsuff's self-interest included prolonging the arbitration throughout the merger negotiations to keep Isramco's value artificially

3

reduced. While that matter remains for decision on a record, what I can find at the pleading stage is that both the Board's agreement to allow Tsuff to participate, and the participation itself, would have been material to a stockholder attempting to evaluate the proposed merger. At this pleading stage, this makes business judgment review under *MFW* unavailable.

A statement of the relevant facts alleged, and my reasoning, follow.

## I. BACKGROUND[3]

*A. The Parties and Relevant Non-Parties[4]*

Plaintiff Joseph Lawrence Ligos is a former stockholder of Isramco.[5] He continuously owned shares of Isramco stock from the announcement to the consummation of the Buyout.[6]

---

[3] Unless otherwise noted, the facts referenced in this Memorandum Opinion are drawn from the Verified Shareholder Class Action Complaint (referred to herein as the "Complaint") and the documents incorporated therein. *See generally* Compl., Dkt. No. 1. I may also consider documents produced by the Defendants in response to the Plaintiff's 8 Del. C. § 220 books and records demand "to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020).

[4] The Plaintiff voluntarily dismissed J.O.E.L Jerusalem Oil Exploration Ltd. ("JOEL"), Equital, Ltd. ("Equital"), YHK Investment L.P. ("YHK"), YHK General Manager Ltd. ("YHK Manager"), and United Kingsway Ltd. ("Kingsway") without prejudice on August 5, 2020. Notice of Voluntary Dismissal as to Certain Defs., Dkt. No. 10. Joseph From, Frans Sluiter, and Isramco, Inc. were also voluntarily dismissed from this action with prejudice on May 26, 2021. Order of Dismissal with Prejudice as to Certain Defs., Dkt. No. 62.

[5] Compl. ¶ 13.

[6] *Id.*

Non-party Isramco is a Delaware corporation headquartered in Houston, Texas.[7]   In October 2019, Isramco's controller—Defendant Naphtha—and its affiliates consummated a going-private transaction by purchasing all of Isramco's unaffiliated stock for cash consideration (the "Buyout").[8] Prior to the consummation of the Buyout, Isramco was publicly traded on the NASDAQ Capital Market.[9]

Defendant Naphtha Holding LTD. ("NHL") is an Israeli company wholly owned by Naphtha.[10]   Prior to the Buyout, NHL directly owned approximately 58.6% of Isramco's outstanding shares.[11]

Defendant I.O.C. – Israel Oil Company, LTD.  ("I.O.C.") is an Israeli private company.[12]   Prior to the Buyout, I.O.C. directly owned approximately 12.1% of Isramco's outstanding shares.[13]

Defendant Naphtha is an Israeli public company whose securities trade on the Tel Aviv Stock Exchange.[14] Its principal businesses are exploration and production of oil and natural gas.[15]   Naphtha owns 99.9% of I.O.C. and 100% of NHL.[16]

---

[7] *Id.* ¶ 14.
[8] *Id.* at 1–2, ¶ 142.
[9] *Id.* ¶ 14.
[10] *Id.* ¶ 22.
[11] *Id.*
[12] *Id.* ¶ 23.
[13] *Id.*
[14] *Id.* ¶ 21.
[15] *Id.*
[16] *Id.* ¶¶ 22–23.

Accordingly, prior to the Buyout, Naphtha beneficially owned 70.7% of Isramco's outstanding common stock.[17]

Defendant Naphtha US Oil, Inc. ("Merger Sub") is a Delaware corporation formed by I.O.C. to effectuate the Buyout.[18] I.O.C. owns 100% of the outstanding shares of common stock of Merger Sub.[19]

Defendant Haim Tsuff ("Tsuff") served as Isramco's President and the Chairman of its Board from May 1996 until consummation of the Buyout on October 25, 2019.[20] He served as the Company's Chief Executive Officer ("CEO") from May 1996 until November 2017, and as Co-CEO from November 2017 until consummation of the Buyout in October 2019.[21] Tsuff is also a director of NHL, I.O.C., Merger Sub, and Naphtha, and the Chairman of Naphtha's board of directors.[22] Prior to the Buyout, Tsuff directly owned 61,679 shares of Isramco common stock and, through interests in Naphtha, indirectly owned an additional 1,922,517 shares, which collectively totaled approximately 73% of the Company's outstanding shares.[23] The relationship of the parties is graphically represented in Figure 1.

---

[17] *Id.* ¶ 21.
[18] *Id.* ¶ 24.
[19] *Id.*
[20] *Id.* ¶ 25.
[21] *Id.*
[22] *Id.* ¶¶ 21–24.
[23] *Id.* ¶ 15.

Tsuff, Naphtha, NHL, I.O.C., and Merger Sub are referred to collectively herein as the "Purchaser Group Defendants." According to the Proxy, Tsuff was "in a position to indirectly determine the investment and voting decisions made by each of the" Purchaser Group Defendants by virtue of his beneficial ownership of Isramco stock and "the ownership and management structures" of the Purchaser Defendants.[24]

Defendant Negev 2 is an Israeli public limited partnership formed by Isramco in 1989.[25] Tsuff is the Chairman of its board of directors.[26] Naphtha holds controlling interests in Negev 2, and I.O.C. fully owns and controls Negev 2's general partner, a non-party.[27] Negev 2 owns a working interest in the Tamar oil and gas field located in the Levantine basin in the Mediterranean Sea (the "Tamar Field") from which Isramco receives a royalty stream (the "Tamar Royalty").[28] The Tamar Royalty was the Company's single largest source of revenue.[29] A dispute between Negev 2 and Isramco as to the Tamar Royalty was in arbitration at the time of the Buyout (the "Tamar Arbitration").[30]

Non-Party Eran Saar is the CEO of Naphtha and a director of Negev 2.[31]

---

[24] *Id.* (*quoting* Proxy at 65).
[25] *Id.* ¶¶ 27, 36.
[26] *Id.* ¶ 26.
[27] *Id.* ¶ 27.
[28] *Id.*
[29] *Id.* ¶ 3.
[30] *Id.* ¶¶ 58–63.
[31] *Id.* ¶¶ 72, 76

7

*B. Factual Background*

### 1. The Tamar Royalty

In May 2001, Isramco joined a partnership that held two offshore exploratory licenses in the Tamar Field, known as the Matan and Michal licenses, which generated the Tamar Royalty revenue stream.[32] By March 2007, when the Company filed its 2006 Form 10-K, Isramco, through its interests in Negev 2, held a 27.5% working interest and overriding royalties in the Matan and Michal licenses.[33]

In late 2007, however, the Company decided to close its Israel branch office and focus instead on development and exploration in the United States.[34] The Complaint alleges that Isramco's shift towards operations in the United States was part of a campaign by Tsuff to strip Isramco of its valuable interests in the Tamar Field for the benefit of other Tsuff-controlled entities such as Naphtha and Negev 2.[35]

In connection with this shift, Isramco and I.O.C. entered into an Israel Branch Sale Agreement, pursuant to which Isramco sold to I.O.C. its Israel-based activities and assets conducted and managed by the Company's Israel branch office.[36] These

---

[32] *Id.* ¶ 40.
[33] *Id.* ¶ 41.
[34] *Id.* ¶ 42.
[35] *Id.* ¶¶ 42, 55, 57.
[36] *Id.* ¶ 44.

assets included Isramco's general and limited partnership interests in Negev 2, which continued to own a working interest in the Tamar Field.[37]

As a result, by the end of 2008, Isramco's working interest in the Matan license was reduced to zero, and its overriding royalties in the Matan license—i.e., the Tamar Royalty—were reduced to 1.4375% of the revenues received by Negev 2 from the Tamar Field.[38] The Tamar Royalty was set to increase to 2.7375%, however, after the triggering of a payout date (the "Payout Date").[39] This represented a 78% increase, which translated to an additional $8.84 per share in royalty income.[40] The Payout Date was calculated based on the amount of certain expenses incurred by Negev 2 relative to the revenue that Negev 2 received from the Tamar Field.[41] In other words, higher costs meant that more revenue was required to reach the Payout Date.[42]

The Tamar Royalty was the Company's single largest source of revenue, and the Company disclosed in each of its Annual Reports dating back to 2014 that the Tamar Royalty was "expected to be very significant to the Company for the foreseeable future."[43]

---

[37] *Id.* ¶¶ 27, 44.
[38] *Id.* ¶ 45.
[39] *Id.* ¶¶ 3, 45.
[40] *Id.* ¶ 3.
[41] *Id.* ¶ 57.
[42] *Id.*
[43] *Id.* ¶¶ 3, 57.

## 2. Tamar Arbitration

According to the Complaint, beginning in late 2016, Tsuff, through his beneficial ownership of Negev 2, attempted to delay the Payout Date by continually adding expenses to the Payout Date calculation.[44] Specifically, in 2016, Negev 2 added $39 million in "solo expenses," such as legal and insurance expenses, to the Payout Date equation, which pushed the Payout Date back from 2016 to the first quarter of 2017.[45] Then, in February 2017, Negev 2 asserted that the calculation should also include "financing expenses."[46]

In light of Negev 2's shifting cost calculations, on February 26, 2017, the Tamar Arbitration commenced between Isramco and Negev 2 concerning "what costs should be included in the payout calculation" for the purposes of calculating the timing of the Payout Date.[47] At a preliminary hearing on August 13, 2017, Negev 2 again added "hundreds of millions of . . . dollars" in expenses to its purported Payout Date calculation.[48]

In November 2017, as disclosed in the Proxy, Tsuff and Saar met with Baker Botts L.L.P. ("Baker Botts") to discuss a potential purchase by Naphtha of the remaining Isramco shares.[49] The Proxy does not disclose, however, that, also in

---

[44] *Id.* ¶¶ 3–4, 69–71.
[45] *Id.* ¶ 71.
[46] *Id.* ¶ 74.
[47] *Id.* ¶¶ 59, 63 (*quoting* the Company's 2016 Form 10-K).
[48] *Id.* ¶ 75.
[49] *Id.* ¶ 76 (*citing* Proxy at 12).

November 2017, the Company's Board met and the Board's Conflict Committee "'(i) reauthorized the limited involvement of Haim Tsuff in the Tamar [A]rbitration and (ii) approved the assistance of Eran Saar . . . in the Tamar [A]rbitration.'"[50]

On November 27, 2017, a few weeks after the Conflict Committee authorized Tsuff's and Saar's involvement in the Tamar Arbitration, Negev 2 submitted a revised position in the Tamar Arbitration asserting $950 million in additional expenses to the Payout Date calculation, which it contended would delay the Payout Date "until the end of 2019."[51] Isramco, in contrast, believed that the Payout Date was "around the middle of 2015."[52]

Isramco and Negev 2 also disagreed as to the amount at stake in the Tamar Arbitration. Specifically, Isramco disclosed in its 2016 Form 10-K that it believed the scope of the disagreement was approximately $15 million, and it later disclosed in its 2017 Form 10-K that it believed this figure to be $45 million, not including the value of Isramco's counterclaims against Negev 2.[53] In contrast, Negev 2 estimated the scope of disagreement to be approximately $73 million, before taxes.[54]

Isramco submitted a Statement of Claim in the Tamar Arbitration on February 25, 2018, and Negev 2 submitted its response on August 8, 2018.[55] The Company

---

[50] *Id.* ¶ 77; Decl. of Daniel T. Menken in Support of Naphtha OB, Ex. 9 at 2.
[51] Compl. ¶ 78.
[52] *Id.* ¶ 61 (*quoting* the Company's 2017 Form 10-K).
[53] *Id.* ¶ 62.
[54] *Id.*
[55] *Id.* ¶ 63.

disclosed in its Form 10-Q for the quarter ended June 30, 2019 that the Tamar Arbitration was "in its early stages with the parties expected to complete the discovery process in the coming months," and "[t]he Company expect[ed] the discovery and evidentiary filings . . . to conclude in 2019, with evidentiary hearings to occur in February of 2020."[56]

### 3. The Buyout

On March 21, 2018, with the Tamar Arbitration still ongoing, and one month after Isramco filed its Statement of Claim, the Purchaser Group Defendants filed an amendment to their Schedule 13D disclosing that they were in the preliminary stages of evaluating a potential acquisition of unaffiliated shares of Company stock or another going-private transaction involving the Company.[57] Naphtha thereafter submitted a letter to the Board on May 24, 2018 indicating that it was interested in exploring the possibility of a transaction involving Naphtha's acquisition of all unaffiliated shares of Isramco stock in exchange for cash (the "Indication of Interest").[58] The Indication of Interest stated that Naphtha expected "that the Company's board of directors will appoint a special committee of independent

---

[56] *Id.* ¶ 63 (*quoting* the Company's Q2 2019 10-Q).
[57] *Id.* ¶ 80.
[58] *Id.* ¶ 81.

directors to engage in this process and make a recommendation to the Company's board of directors with respect to any Transaction."[59]

On June 5, 2018, the Board met and appointed a special committee (the "Special Committee") to review, evaluate, and negotiate a potential transaction with Naphtha.[60] On October 5, 2018, the Special Committee selected Duff & Phelps Securities, LLC and Duff & Phelps, LLC (together, "Duff & Phelps") as a financial advisor.[61] The Board never reversed the November 2017 decision to authorize Tsuff's and Saar's involvement in the Tamar Arbitration.[62]

On January 8, 2019, over a year after the Board reauthorized Tsuff and authorized Saar to participate in the Tamar Arbitration, Naphtha submitted an initial proposal to acquire the unaffiliated shares of Isramco stock for $110.36 per share in cash.[63] The January 8, 2019 proposal stated that the transaction would be conditioned on the Special Committee's recommendation and a majority vote of the Company's minority stockholders.[64] After three months of negotiations, which included numerous discussions related to the Tamar Royalty and Tamar Arbitration,[65] Naphtha increased its proposal to $121.40 per share on April 4, 2019,

---

[59] Id. ¶ 82.
[60] Id. ¶ 84.
[61] Id. ¶ 87.
[62] Id. ¶ 90.
[63] Id. ¶ 91.
[64] Id. ¶ 83.
[65] See, e.g., id. ¶¶ 95–96, 98–100, 105–06, 108–16, 119–21, 124–25, 130–32, 134, 136.

which the Special Committee approved on the same day.[66]  On May 20, 2019, Duff & Phelps presented its fairness opinion to the Special Committee, which included an assessment of various potential outcomes to the Tamar Arbitration.[67]  The Special Committee then recommended that the Board approve the Buyout, and the Board met, with Tsuff recused, and approved the Buyout and resolved to recommend to the Company's stockholders that they do the same.[68]

On October 22, 2019, a majority of the unaffiliated Isramco stockholders voted to approve the Buyout.[69]  The Proxy described aspects of the Tamar Arbitration, including Duff & Phelps's assessment regarding the potential proceeds from the arbitration, and that Naphtha controlled Negev 2,[70] but it did not disclose the Conflict Committee's decision in November 2017 to reauthorize Tsuff's participation in the Tamar Arbitration.[71]

*C. Procedural History*

The Plaintiff initiated this action on June 4, 2020.[72]  The Complaint brings claims for breach of fiduciary duty against the Purchaser Group Defendants (Count

---

[66] *Id.* ¶¶ 136–38.
[67] *Id.* ¶ 141.
[68] Proxy at 21.
[69] Compl. ¶ 142.
[70] Proxy at 12, 31.
[71] Compl. ¶ 148.
[72] *See* Compl.

I) and the Director Defendants[73] (Count II), for unjust enrichment against the Purchaser Group Defendants (Count III), and for aiding breaches of fiduciary duty against Negev 2 (Count IV) and Kingsway, YHK Manager, YHK, Equital, JOEL, Naphtha, I.O.C., and Merger Sub (Count V).[74] On August 5, 2020, the Plaintiff dismissed his claims against JOEL, Equital, YHK, YHK Manager, and Kingsway without prejudice.[75]

On September 21, 2020, three groups of defendants filed separate motions to dismiss: (i) Naphtha, NHL, I.O.C., and Tsuff;[76] (ii) From, Sluiter, and Isramco (the "Isramco Motion");[77] and (iii) Pridgeon, Yarkoni, and Hasson.[78] Negev 2 moved to dismiss on December 14, 2020.[79] The parties fully briefed the four motions by February 26, 2021.[80]

---

[73] The Complaint defines the Director Defendants to include Tsuff, Joseph From, Max Pridgeon, Asaf Yarkoni, Frans Sluiter and Nir Hasson. Compl. ¶ 33. The Plaintiff subsequently dismissed From and Sluiter with prejudice on May 26, 2021. Order of Dismissal with Prejudice as to Certain Defs., Dkt. No. 62.

[74] Compl. ¶ 159–87.

[75] Notice of Voluntary Dismissal as to Certain Defs., Dkt. No. 10.

[76] Mot. to Dismiss of Defs. Naphtha, Holdings, US Oil, and Tsuff, Dkt. No. 23 [hereinafter "Naphtha Mot."]; Opening Br. in Supp. of Naphtha Mot., Dkt. No. 24 [hereinafter "Naphtha OB"].

[77] Defs. From, Sluiter, and Isramco's Mot. to Dismiss, Dkt. No. 26 [hereinafter "Isramco Mot."]; Opening Br. in Supp. of Isramco Mot., Dkt. No. 26.

[78] Defs. Pridgeon, Yarkoni, and Hasson's Motion to Dismiss, Dkt. No. 28 [hereinafter "Special Committee Mot."]; Opening Br. in Supp. of Special Committee Mot., Dkt. No 28.

[79] Def. Negev's Mot. to Dismiss, Dkt. No. 39 [hereinafter "Negev 2 Mot."]; Opening Br. in Supp. of Negev Mot., Dkt. No. 40 [hereinafter "Negev 2 OB"].

[80] Pl.'s Answering Br. in Opp'n to Naphtha Mot., Isramco Mot., and Special Committee Mot., Dkt. No. 36 [hereinafter "Pl.'s First Br."]; Reply Br. in Further Supp. of Isramco Mot., Dkt. No. 45; Reply Br. in Further Supp. of Special Committee Mot., Dkt. No 46; Reply Br. in Supp. of Naphtha Mot., Dkt. No. 47; Pl.'s Answering Br. in Opp'n to Negev 2 Mot., Dkt. No. 52; Reply Br. in Supp. of Negev 2 Mot., Dkt. No. 54.

I heard oral argument on all motions to dismiss on May 21, 2021.[81] On May 26, 2021, the Plaintiff voluntarily dismissed From, Sluiter, and Isramco from this action, mooting the Isramco Motion, and I consider the remaining motions submitted for decision as of that date.[82]

## II. ANALYSIS

### A. Legal Standards

The Defendants seek dismissal under Rule 12(b)(6).[83] At the pleading stage, I must take as true all well-pled allegations and draw inferences therefrom in the light most favorable to the Plaintiff.[84] I may only grant the motions to dismiss if I find it not "reasonably conceivable" that the Plaintiff may prevail.[85]

When a controller exists on both sides of a merger, the default standard of review is entire fairness.[86] This is because the existence of a controller is likely to undermine the dual statutory protections of disinterested board and stockholder approval.[87] Under the rubric laid out in *MFW*, however, a controller can deploy these dual procedural protections and gain the benefit of business judgment review

---

[81] Tr. of Oral Arg. on Defs.' Mots. to Dismiss, Dkt. No. 63.

[82] Order of Dismissal with Prejudice as to Certain Defs., Dkt. No. 62.

[83] Certain Defendants have also moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2). *See* Naphtha OB § II; Negev 2 OB § II. Because this Memorandum Opinion decides only the motions to dismiss under Rule 12(b)(6) arguing that the transaction was fully compliant with the *MFW* rubric, I do not discuss the Rule 12(b)(2) standard in this opinion.

[84] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536-37 (Del. 2011).

[85] *Id.* at 537.

[86] *M & F Worldwide*, 88 A.3d at 644.

[87] *Id.*

16

of the transaction.[88]  Specifically, for a controller transaction to be subject to business judgment review under *MFW*, the transaction must be (i) approved by an independent and empowered special committee and (ii) by an uncoerced, informed majority of the Company's minority stockholders.[89]

The Plaintiff attacks the Defendants' compliance with the *MFW* protocol on numerous grounds.  The second requirement of *MFW* is dispositive here, I find, because the minority stockholders were not adequately informed when they voted to approve the Buyout.

*B. The Minority Stockholder Vote Was Uninformed*

The Plaintiff argues that the Proxy was incomplete because it did not disclose, among other things, that the Conflict Committee reauthorized Tsuff's participation in the Tamar Arbitration.[90]  The Plaintiff contends that it was material for stockholders to know that Tsuff participated in a proceeding that impacted the valuation of Isramco, especially given the temporal proximity between the reauthorization, the initial meeting among Tsuff, Saar and Baker Botts to discuss a potential Isramco transaction, and Negev 2's submission of a revised position in the arbitration that the Payout Date would not occur until the end of 2019.[91]  The

---

[88] *Id.*
[89] *Id.* 654.
[90] Compl. ¶ 148.
[91] Pl.'s First Br. at 55–57.

Plaintiff also contends that this omission was material because Tsuff's participation created the reasonable impression that Naphtha used Tsuff's knowledge of the Tamar Arbitration to inform its Indication of Interest.[92]

The Defendants argue that the Conflict Committee's decision to reauthorize Tsuff's participation in the Tamar Arbitration adds nothing to the "total mix" of information and is merely "cumulative to the information already disclosed"—i.e., that Negev 2 was involved in the proceedings, and Naphtha held a controlling interest in Negev 2, as well as Isramco.[93] The Defendants contend that because the minority stockholders were informed of Naphtha's controlling interest in Negev 2, they already knew that Naphtha had a window into the Tamar Arbitration proceedings.[94]

The Defendants also assert that, for the Plaintiff to establish that this omission was material, the Complaint must have pled what Tsuff's role was in the Tamar Arbitration, what information he learned that he otherwise would not have known, what information he passed on to Naphtha, and how that information affected Naphtha's Indication of Interest.[95]

---

[92] Compl. ¶ 148; Pl.'s First Br. at 56.
[93] Naphtha OB at 45. *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *12 (Del. Ch. June 30, 2014).
[94] Naphtha OB at 45.
[95] Naphtha OB at 44–45.

The Defendants seek to impose too high a bar at this stage of the proceedings. Making all plaintiff-friendly inferences, it is plausible that after obtaining the Conflict Committee's reauthorization to participate in the proceedings, Tsuff did participate. I can also infer at this stage that Tsuff, who, as the ultimate controller of Isramco, Negev 2, and Naphtha, stood on both sides of the Buyout and the Tamar Arbitration, acted for his own interests in the Tamar Arbitration.[96] The Plaintiff theorizes that Tsuff advanced his own interests by delaying the outcome of the Tamar Arbitration—which concerned the Company's largest revenue stream, the Tamar Royalty—in order to artificially deflate the value that the Special Committee ascribed to Isramco.[97] Whether that is true is a matter to be developed by the record; for now, it is enough to say that Tsuff's participation in the Tamar Arbitration would have been material to the minority stockholders attempting to evaluate the Buyout.[98]

Moreover, the Conflict Committee's decision itself to reauthorize Tsuff's participation was also material to the minority stockholders. Absent a disclosure to the contrary, the Isramco stockholders were entitled to presume that the Board would act in the stockholders' best interests, rather than the controller's, especially in a

---

[96] *See Chester Cty. Emps.' Ret. Fund v. KCG Holdings, Inc.*, 2019 WL 2564093, at *13 n.64 (Del. Ch. June 21, 2019) ("reasonable to infer that [potentially conflicted director] was acting in his own interests").

[97] Compl. ¶ 5.

[98] *See In re Tesla Motors, Inc. S'holder Litig.*, 2020 WL 553902, at *9 (Del. Ch. Feb. 4, 2020) (controller's "involvement in the process beyond what was disclosed in the proxy would likely have been something a reasonable stockholder would have considered important when deciding whether to vote for the [m]erger").

19

buyout that purportedly employed the dual protections against controller conflicts laid out in *MFW*.[99] This included the Board's acting to pursue Isramco's interest in the Tamar Arbitration. In other words, the independent stockholders would not assume, absent disclosure, that the Board would permit the controller to participate in the arbitration. The progress and likely outcome of the Tamar Arbitration, and its effect on the timing and value of the Tamar Royalties, was material to the valuation of the Company, which obviously is the overriding concern of a stockholder contemplating a merger. That the Conflict Committee decided to allow Tsuff to participate in the Tamar Arbitration, which plausibly impacted Isramco's valuation, was therefore material for stockholders to know.[100]

I note that a finding, as here, that the Plaintiff has adequately pled an uninformed stockholder vote is sufficient to negate the application of the business judgement rule to the transaction under the *MFW* line of cases. A finding that the Board did not adequately inform the stockholder vote is not enough, standing alone,

---

[99] *See In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *13 (Del. Ch. May 25, 2021) ("Delaware law presumes 'that a director's decision is based on the corporate merits of the subject matter before the board rather than extraneous considerations or influence,'" including in the controller context) (*citing In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *11 (Del. Ch. May 22, 2000)).

[100] *Cf. Chester Cty.*, 2019 WL 2564093, at *13 n.64 (accepting "reasonable . . . infer[ence] that [director's] . . . own interests . . . or those of his management team or employees . . . overtook his duties to the stockholders when he was charged with obtaining the highest deal price," "that information is material").

to plead a breach of duty action against individual directors, however.[101]  Here, Isramco has an exculpation clause for director liability.[102]  Accordingly, a pleading that any director breached a duty for failure to disclose or lack of candor, to withstand a motion to dismiss, must allege facts making it "reasonably conceivable" that such a failure to disclose was in bad faith or otherwise disloyal.  This determination awaits the parties' review of this decision and any supplemental briefing.

*  *  *

Defendant Tsuff's motion to dismiss the Plaintiff's breach of fiduciary duty claim against him (Count I) rests solely on the argument that the Buyout met the conditions laid out in *MFW* and should therefore be evaluated under the business judgment rule.  Because I have determined that application of business judgement review under *MFW* is not available, Tsuff's motion to dismiss is denied as to Count I. The remaining motions to dismiss raise other distinct issues and therefore remain outstanding.

### III. CONCLUSION

For the foregoing reasons, Defendant Tsuff's motion to dismiss is denied as to Count I.  The other Defendants' motions to dismiss remain outstanding.  The

---

[101] Nor does the Conflict Committee's decision to allow Tsuff's participation in the Tamar Arbitration necessarily imply a breach of duty.
[102] Isramco, Inc. Certificate of Incorporation at 16.

21

parties should confer, provide a form of order consistent with the decision above, and inform me in light of this decision whether further briefing is appropriate.