# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HOLLYWOOD FIREFIGHTERS' PENSION FUND and SHEET METAL WORKERS' LOCAL UNION NO. 80 PENSION TRUST FUND, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0880-SG |
| JOHN C. MALONE, GREGORY B. MAFFEI, GREGG L. ENGLES, RONALD A. DUNCAN, DONNE F. FISHER, and RICHARD R. GREEN, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 5, 2021
Date Decided: November 8, 2021

Gregory V. Varallo and Andrew E. Blumberg, of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Michael Hanrahan, Kevin H. Davenport, and Mary S. Thomas, of PRICKETT, JONES & ELLIOTT, P.A.; OF COUNSEL: Mark Lebovitch, Jacqueline Y. Ma, and Daniel E. Meyer, of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Lee D. Rudy, Eric L. Zagar, Christopher M. Windover, and Matthew C. Benedict, of KESSLER TOPAZ MELTZER & CHECK, LLP, Randor, Pennsylvania; Robert D. Klausner, of KLAUSNER KAUFMAN JENSEN & LEVINSON, P.A., Plantation, Florida; and Aaron T. Morris, of MORRIS KANDINOV LLP, Stowe, Vermont, *Attorneys for Plaintiffs Hollywood Firefighters' Pension Fund and Sheet Metal Workers' Local Union No. 80 Pension Trust Fund.*

Robert S. Saunders, Joseph O. Larkin, Matthew P. Majarian, and Ryan M. Lindsay, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; OF COUNSEL: Richard B. Harper, Thomas E. O'Brien, and Vern Cassin, of BAKER BOTTS LLP, New York, New York, *Attorneys for Defendants John C. Malone and Gregory B. Maffei*.

Kenneth J. Nachbar, Megan W. Cascio, Thomas P. Will, and Sarah P. Kaboly, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Defendant Gregg L. Engles*.

Douglas D. Herrmann and Emily L. Wheatley, of TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware, *Attorneys for Defendants Ronald A. Duncan, Donne F. Fisher, and Richard R. Green*.

**GLASSCOCK, Vice Chancellor**

To historically-minded Delawareans, the Wedge brings to mind a political delta of land at the state's northwestern corner. Delaware's western boundary is the Transpeninsular line, separating the state from Maryland. Its northern boundary with Pennsylvania, uniquely, is formed by an arc with a radius of twelve miles—the Twelve Mile Circle line—measured (originally at least) from the cupola of the Court House in New Castle. The line separating Maryland and Pennsylvania, of course, is the Mason-Dixon line. If these three lines were intended to meet at a point, that intention was frustrated. The tangent of the Twelve Mile Circle missed the intersection of Mason-Dixon and Transpeninsular lines, passing to its east, and intersecting the Transpeninsular to the south. The rough square-mile triangle resulting was the subject of a boundary dispute between Pennsylvania and Delaware not settled until the 1920s.

Corporate finance academics have another delta in mind when they speak of "the Wedge." That delta represents the difference between the percentage of corporate ownership held by a stockholder, and the percentage of voting power represented by her stock; that differential results where various classes of stock have distinct voting rights. Where voting power is concentrated in stockholders owning a minority of corporate equity, misalignments of interest arise, and the greater such disparity (the larger the Wedge, in other words) the more the misalignment decreases the value of the company, theoretically at least.

1

Before me is a contested mootness fee request. The Plaintiffs sought injunctive relief regarding a corporate merger, arguing that the merger violated Delaware General Corporation Law (the "DGCL"), specifically Section 203.[1] The parties agreed to a preliminary injunction stipulation (the "PI Stipulation") that, among other features, decreased the Wedge that would exist, post-transaction. The litigation continued over other issues resulting from the transaction, and the Plaintiffs procured a large damages award for their class (the "Settlement"), for which I have approved their attorneys' fees and costs in the amount of $22 million.[2] That award is not at issue. The Plaintiffs here have filed a motion for a mootness fee (the "Motion"), seeking an additional $22 million, for the benefits conferred by the PI Stipulation, most but not all of which, in their view, is justified by the reduction of the Wedge. They refer to an expert report, which ascribes very large theoretical benefits to the Wedge reduction. The Defendants agree that a mootness fee is appropriate, for the benefit achieved of compliance of the merger with Section 203, but argue that the benefits of the Wedge reduction are speculative and do not run to the Plaintiff class. They suggest an award of $1 (or perhaps $2) million. I find that I can award an appropriate mootness fee without addressing the pertinence

---

[1] 8 *Del. C.* § 203.
[2] Stipulation and Agreement of Settlement, Compromise, and Release, Dkt. No. 123 [hereinafter "Settlement Stip."].

of the contentious Wedge issue. I find a fee of $9.35 million appropriate. My reasoning follows.

## I. BACKGROUND[3]

*A. The Parties*

The Plaintiffs in the action are Hollywood Firefighters' Pension Fund, West Palm Beach Firefighters' Pension Fund, and Sheet Metal Workers' Local Union No. 80 Pension Trust Fund (together, the "Plaintiffs").[4]

The Defendants in the action include GCI Liberty, Inc. ("GCI" or the "Company") and members of its Board of Directors (the "Board"): John C. Malone, Gregory B. Maffei, Gregg L. Engles, Ronald A. Duncan, Donne F. Fisher, Richard R. Green, and Sue Ann Hamilton (collectively with the Company, the "Defendants").[5] Malone is GCI's Chairman of the Board. Maffei is GCI's chief executive officer.

---

[3] I draw these facts from the PI Stipulation and from the parties' papers submitted in connection with the Motion. Where further facts are necessary, I draw from the First Amended Complaint, following *In re Activision Blizzard, Inc. S'holder Litig. See In re Activision*, 124 A.3d 1025, 1030–31 (Del. Ch. 2015). "The Complaint's contents provide a sound basis for evaluating the Settlement, because its allegations present Lead Counsel's claims in the strongest possible light . . . . What follows are not formal factual findings." *Id.* While this Motion pertains specifically to the PI Stipulation and fees associated with the same, rather than the Settlement, the *Activision* reasoning still applies.

[4] West Palm Beach Firefighters' Pension Fund ultimately withdrew as a Plaintiff in the action on February 19, 2021. *See* Granted ([Proposed] Order Granting Withdrawal of Plaintiff West Palm Beach Firefighters' Pension Fund), Dkt. No. 113. It has been included in the above definition for purposes of strictly construing the factual universe as it existed at the time of the PI Stipulation.

[5] *See* Stip. at 2. Similarly, Sue Ann Hamilton and GCI were not named as defendants in the Second Amended Complaint, but have been included in the above definition to reflect the facts existing at the time of the PI Stipulation. *See* Second Am. Verified Class Action Compl., Dkt. No. 87.

The term Stipulating Parties includes each of the Plaintiffs and the Defendants.[6]

*B. Factual Overview*

1. The Original Merger Agreement and Merger Consideration

The instant case arose from the stock-for-stock merger between the Company and Liberty Broadband Corporation ("Broadband"), announced in August 2020 (the "Merger").[7] The consideration for the Merger anticipated at that time, broadly speaking, would effect an exchange of the Company's one-vote-per-share Series A stock ("GCI Series A stock") for Broadband's zero-vote-per-share Series C stock ("Broadband Series C stock").[8] The consideration also contemplated Malone, the Chairman of GCI, and Maffei, the CEO of GCI, each converting their shares of the Company's ten-vote-per-share Series B stock ("GCI Series B stock") into Broadband's ten-vote-per-share Series B stock ("Broadband Series B stock").[9]

Further, Maffei owned certain GCI options (the "GCI Series B Options") exercisable for shares of supervoting GCI Series B stock.[10] As a result of the Merger, these GCI Series B Options were to be converted into Broadband options exercisable

---

[6] Granted (Stipulation and [Proposed] Order Withdrawing Mot. for Prelim. Inj.) 2, Dkt. No. 84 [hereinafter "Stip."].
[7] Pls.' Opening Br. Supp. Mot. Att'ys' Fee Award Benefits Conferred by the Prelim. Inj. Stipulation 1, Dkt. No. 125 [hereinafter "OB"].
[8] *Id.* at 3–4.
[9] *Id.* at 4.
[10] *Id.* at 16.

for Broadband Series B stock (the "Rollover Broadband Series B Options"), preserving the supervoting nature of the Series B across the conversion.[11]

In addition to the anticipated conversions in connection with the Merger, Malone negotiated for a relatively bespoke agreement that would have provided him with the ability to maintain his 49% voting power in the combined company post-Merger if his voting power was diluted (the "Exchange Agreement").[12] The Exchange Agreement would have operated by exchanging shares of Broadband Series C stock for Broadband Series B stock (i.e., exchanging zero-vote shares for ten-vote shares).[13]

Although less thoroughly briefed, the Exchange Agreement is alleged to have been designed such that "personal benefits" encapsulated in the agreement could be transferred from Malone to Maffei.[14] The Plaintiffs also alleged that Malone "insisted on" the ability to transfer his supervoting shares to Maffei,[15] though it is unclear whether the transferability pertained to pre-Merger GCI Series B stock or post-Merger Broadband Series B stock, and whether the transferability was memorialized in the Exchange Agreement or elsewhere.

---

[11] *Id.* at 17.
[12] *Id.* at 5.
[13] *Id.*
[14] *Id.*
[15] *Id.*

5

## 2. The Design of the Original Merger

The Plaintiffs' Opening Brief in support of the Motion alleges that the genesis of actions behind the Merger was in November 2019, when Maffei, as CEO of GCI, communicated to investors that the market overvalued GCI relative to Broadband.[16] The Plaintiffs' discovery prior to the filing of the First Amended Complaint indicated that this statement was borne of deliberate changes made to the accounting practices underlying this assertion.[17]  Maffei's statements to investors allegedly caused the GCI stock price to suffer relative to Broadband.[18]

In March 2020, the exchange ratio for a merger between GCI and Broadband was at an "all-time low" for GCI stockholders.[19]  On March 26, 2020, Broadband formed a special committee which, in April, submitted an indication of interest to the GCI Board.[20]  That indication of interest was conditioned upon satisfaction of the *MFW* factors.[21]

Following receipt of the indication of interest, the GCI Board formed its own Special Committee (the "Special Committee"), composed of Defendants Gregg

---

[16] *Id.*
[17] *Id.* at 11–12.
[18] *Id.* at 12.
[19] *Id.*
[20] Am. Verified Class Action Compl. Declaratory and Injunctive Relief, ¶ 117, Dkt. No. 39 [hereinafter "FAC"].
[21] *See generally Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (holding that the business judgment rule applies where (i) a special committee of independent directors has negotiated and approved the deal and (ii) an uncoerced, fully-informed majority of the minority stockholders has voted in favor of the transaction); FAC ¶ 66.

6

Engles and Sue Ann Hamilton.[22] The Plaintiffs raise concerns about Engles's objectivity with respect to his service on the GCI Special Committee, pointing to his long friendships with Maffei and with Anthony Magro, a banker at Evercore, who was ultimately hired as the Special Committee's financial advisor.[23]

A deal had not been reached at the beginning of June 2020, when the GCI stock price began to recover, causing the exchange ratio for the potential transaction to increase.[24] On June 23 and June 24, 2020, Malone's counsel informed the Special Committee that Malone had adopted a Rule 10b5-1 trading plan.[25] As a result, Malone's counsel indicated to the Special Committee that Malone might need to make disclosures to the Securities and Exchange Commission (the "SEC") in the near future, including disclosure of the deal terms or a range of terms being discussed by July 1, 2020.[26] The Plaintiffs imply that Malone's trading plan was designed to create an artificial time pressure to finalize deal terms.[27]

The Broadband special committee made an initial offer to GCI on June 10, 2020, and the companies negotiated over the next two weeks.[28] The companies disclosed on June 29, 2020 that the special committees had reached a "'preliminary

---

[22] OB 13, 19; FAC ¶ 72.
[23] OB 6, 13.
[24] *Id.* at 13.
[25] FAC ¶ 115.
[26] FAC ¶¶ 115, 117.
[27] *Id.* ¶ 117.
[28] OB 13–14.

understanding,'" and the joint press release announcing the Merger was published on August 6, 2020.[29] The deal was conditioned on a majority of minority approval by GCI stockholders.[30]

GCI issued a definitive merger proxy on October 30, 2020, which the Plaintiffs characterized as "materially misleading," for the sake of obtaining stockholder approval of the Merger.[31] In particular, the Plaintiffs complained about the lack of information regarding the potential Section 203 violation, and the failure to disclose management's voting power in the post-Merger company, especially with respect to Malone and Maffei.[32]

### 3. Alleged Effects of the Original Plan of Merger

The Plaintiffs' First Amended Complaint alleged that the Merger, as outlined above, would violate Section 203 of the DGCL, would "irreversibly and unfairly strip GCI Liberty Series A [] holders of 100% of the voting power of their shares" while providing those same holders with unfair economic consideration in connection with the Merger, and would consolidate the control group (Maffei and Malone)'s voting power over the combined entity post-Merger.[33] As above, the

---

[29] *Id.* at 17.
[30] *Id.*
[31] FAC ¶ 1.
[32] *Id.* ¶ 179.
[33] *Id.* ¶ 1.

Plaintiffs also claim that the disclosure provided by the Company to its stockholders in its merger proxy was insufficient.[34]

According to the First Amended Complaint, prior to the Merger, Malone owned approximately 4.5% of GCI's equity, but approximately 25.4% of GCI's voting power.[35] With respect to Broadband, Malone owned approximately 3.6% of the equity while holding 48.8% of the voting power.[36] (These discrepancies are what the Plaintiff points to as "the Wedge.") For his part, Maffei held 1.2% of the equity in GCI, but 9.9% of the voting power, assuming exercise of the GCI Series B Options.[37] As a point of contrast, Maffei held 1.5% of the equity and 1.1% voting power in Broadband, demonstrating only a small Wedge, and one inverted comparative to the others identified.[38]

Given Malone and Maffei's historic and close relationship, the Plaintiffs allege that the pair can be viewed as a control group with approximately 35.3% voting control of GCI (assuming exercise of Maffei's GCI Series B Options) and approximately 49.9% voting control of Broadband pre-Merger.[39]

---

[34] OB 7; FAC ¶ 3.
[35] FAC tbl. 5.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *See* FAC tbl. 1; OB 10–11.

The Merger consideration as originally designed would have expanded the Broadband voting power figures for both Malone and Maffei following the Merger.[40] The GCI Series A stockholders were slated to receive zero-vote Broadband Series C shares, eradicating any dilutive influence they might have otherwise had upon Malone and Maffei.[41] Per the First Amended Complaint, Malone and Maffei would have held 66.6% of the voting power of the post-Merger company, assuming the exercise of Maffei's Rollover Broadband Series B Options.[42]

The Plaintiffs alleged further that the original Merger would have violated Section 203 of the DGCL.[43] They theorized that Malone became an interested stockholder in May 2018, following a reincorporation merger undertaken by GCI, at which time Malone held 26.9% of the voting power in GCI.[44] This surpasses the 15% voting power threshold established for qualification as an interested stockholder under Section 203, making Malone an interested stockholder.[45] Further, the Plaintiffs asserted that Maffei and/or Broadband became interested stockholders as of June 2020 under the theory that they reached an "agreement, arrangement, or understanding" with Malone regarding voting in connection with the Merger, and

---

[40] *See, e.g.*, OB at 2.
[41] FAC ¶ 9.
[42] *Id.* ¶ 179.
[43] *Id.* ¶ 15.
[44] *Id.* ¶ 52.
[45] *Id.*; *see also* 8 *Del. C.* § 203.

that Maffei and Broadband were similarly subject to Section 203.[46]  Accordingly, as interested stockholders, Malone, Maffei, and Broadband were banned from participating in business combinations with GCI for a period of three years.[47]

To cure the alleged Section 203 defect, the Company would have needed to seek the affirmative vote of two-thirds of the outstanding voting stock of the Company (exclusive of that stock owned by the interested stockholder), or to fold the Merger into an exception in the statute.[48]  The Settling Parties ultimately chose the latter option, as described below.[49]

Finally, the Merger required stockholder approval.  The Plaintiffs claimed that the disclosures made to stockholders regarding the Merger were insufficient.[50]  Among other things, the Plaintiffs sought additional disclosures with respect to the fairness of the transaction, management's voting power after the Merger and management's participation in Merger negotiations.[51]  Without such disclosures, the majority-of-the-minority stockholder vote would have been uninformed and therefore not compliant with *MFW* procedures.[52]

---

[46] FAC ¶ 54; *see also* 8 *Del. C.* § 203.
[47] *See* 8 *Del. C.* § 203.
[48] 8 *Del. C.* § 203.
[49] Defs.' Answering Br. Opp'n to Pls.' Mot. for Att'ys' Fee Award Benefits Conferred by the Prelim. Inj. Stipulation 14, Dkt. No. 141 [hereinafter "AB"].
[50] FAC ¶¶ 178–79.
[51] *Id.*
[52] *See, e.g.*, OB 28 n.74.

### 4. The PI Stipulation and Aftermath

On November 21, 2020, the parties submitted the PI Stipulation to this Court.[53] The PI Stipulation had several effects on the Merger consideration to be received by stockholders.[54]

First, Malone and Maffei both agreed to cause each outstanding share of GCI Series B stock beneficially owned by them to be converted into shares of GCI Series A stock on a one-to-one basis, meaning their supervoting stock was converted into one-vote-per-share stock in GCI, which would be further converted into zero-vote Broadband Series C stock following the Merger.[55]

Second, Maffei further agreed that, if he exercised any Rollover Broadband Series B Options following the Merger, he would receive Broadband Series B stock, which would then be exchanged for Broadband Series C stock on a one-to-one basis.[56] Put another way, following the Merger, Maffei's supervoting options would, upon exercise, collapse down into zero-vote Broadband Series C stock.

Finally, the Exchange Agreement providing Malone with 49% voting control of Broadband would terminate according to its terms at the time of the Merger,

---

[53] *See* Stipulation and [Proposed] Order Withdrawing Mot. for Prelim. Inj., Dkt. No. 85.
[54] *See generally* Stip.
[55] Stip 1, 3.
[56] *Id.* at 3.

because neither Malone nor his affiliates had the right to receive Broadband Series B stock in the Merger.[57]

After the PI Stipulation was entered, GCI filed a Form 8-K that contained supplemental disclosures with respect to the PI Stipulation, as well as additional disclosures regarding the personal relationships between Maffei and Engles, Maffei and Evercore, the financial advisor, and Engles and Magro, the banker employed by Evercore (the "November 24 8-K").[58] The November 24 8-K further provided information regarding management's voting power at Broadband assuming consummation of the Merger.[59]

Once the consideration to be received in the Merger was altered, the Merger did not constitute a prohibited "business combination" under Section 203, as Malone and Maffei benefitted only proportionately as stockholders of GCI.[60] The Plaintiffs agreed as part of the PI Stipulation to dismiss their claims regarding violations of Section 203 on the grounds that such claims were now moot.[61] The Plaintiffs did not otherwise provide any release from liability to the Defendants.[62]

---

[57] *Id.* at 2; OB 20.
[58] OB 27; *see also* GCI Liberty, Inc., Current Report (Form 8-K), at 3 (Nov. 24, 2020).
[59] OB 27.
[60] AB 14; *see also* 8 *Del. C.* § 203(c)(3)(v).
[61] Stip. 7.
[62] OB 7.

## C. Procedural History

In October 2020, the Plaintiffs filed a complaint (the "Original Complaint") alleging breach of fiduciary duties of the Board in connection with the Merger and violation of Section 203 of the DGCL.[63] The Plaintiffs also filed a motion to expedite.[64] Later that month, the motion to expedite was granted.[65] On November 6, 2020, the Court entered a scheduling stipulation laying out the briefing schedule applicable to the Plaintiffs' motion for a preliminary injunction, and identifying December 7, 2020, as the preliminary injunction hearing date.[66] The Plaintiffs began discovery expeditiously, and filed an amended complaint on November 1, 2020 (the "First Amended Complaint").[67] In November, the Plaintiffs and the Defendants completed their document productions, and the Plaintiffs took five depositions.[68] On November 21, 2020, the parties filed the PI Stipulation.[69] I entered the PI Stipulation on November 23, 2020.[70] The Company then filed the November 24 8-K with the SEC, disclosing the terms of the PI Stipulation and certain disclosures regarding

---

[63] Settlement Stip. ¶ A.
[64] *Id.* ¶ B.
[65] *Id.* ¶ C.
[66] *Id.* ¶ D.
[67] *See, e.g.*, *id.* ¶¶ E, I.
[68] *Id.* ¶¶ L, M.
[69] *Id.* ¶ N.
[70] *Id.*

relationships and interactions as described above.[71]  The Merger closed December

18, 2020.[72]

The remainder of the litigation continued until the parties reached an

agreement to settle the action and memorialized the same in a term sheet dated May

5, 2021.[73]  The Stipulation and Agreement of Settlement, Compromise, and Release

was filed on June 17, 2021[74] and I held a settlement hearing, approving the

Settlement and granting the Plaintiffs' counsel $22 million in attorneys' fees in

connection with the Settlement only, on October 5, 2021.[75]

## II. ANALYSIS

### A. Attorneys' Fees under the Corporate Benefit Doctrine

Delaware caselaw permits a plaintiff to recover attorneys' fees under the

corporate benefit doctrine if the applicant can show that "(1) the suit was meritorious

when filed; (2) the action producing benefit to the corporation was taken by the

defendants before a judicial resolution was achieved; and (3) the resulting corporate

---

[71] *Id.* ¶ O.
[72] *Id.* ¶ P.
[73] *Id.* ¶ CC.
[74] *See generally id.*
[75] *See generally* Tr. 10.5.21 Settlement Hr'g and Oral Arg. on Pls.' Req. Mootness Fee, Dkt. No. 142 [hereinafter "Tr. Settlement Hearing"].

benefit was causally related to the lawsuit."[76] Delaware law also provides that the corporate benefit "need not be measurable in economic terms" to support a fee.[77]

The only element subject to any question is whether the suit was meritorious when filed, because the action alleged to produce a corporate benefit here—the entry into the PI Stipulation—clearly occurred prior to a judicial resolution, as the PI Stipulation mooted the need for a preliminary injunction hearing altogether. Additionally, in the PI Stipulation, the Defendants waived any right to assert that the agreements therein were not causally related to the lawsuit, and element (3) is therefore uncontested.[78]

The question of the claims' merit when filed is also easily resolved. A claim is found to be meritorious "'if it can withstand a motion to dismiss on the pleadings [and], at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success.'"[79] The meritorious-when-filed test is a pleading-stage test, and therefore I assess the claims as originally pled in the Original Complaint.

---

[76] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

[77] *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989); *see also Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980) (internal citation omitted) ("But our law recognizes that a pecuniary benefit to the corporation is not a prerequisite to a fee award to counsel.").

[78] Stip. ¶ 11 ("Defendants . . . hereby agree to waive any right to assert . . . that the agreements set forth in this Stipulation were not causally related to the efforts of Plaintiffs' counsel in this Action.").

[79] *Allied Artists*, 413 A.2d at 879 (quoting *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1966)).

I have found previously in this case that the claims in the Original Complaint were, at the minimum, colorable, and so expedited the proceedings.[80] The claims here would have similarly survived a motion to dismiss. Drawing all reasonable inferences in favor of the Plaintiffs, the Original Complaint contains well-pled[81] facts supporting reasonably conceivable inferences that the Merger would violate Section 203,[82] that the disclosures the Company had made in connection with the Merger were insufficient,[83] that the individual directors had breached their fiduciary duties[84] and that Malone and Maffei had breached their fiduciary duties as controlling stockholders.[85]

Altogether, then, the Plaintiffs' counsel should be entitled to an award of attorneys' fees in connection with their efforts in this action. The Plaintiffs have requested an award of $22 million;[86] the Defendants contend that the appropriate size of the fee is $1 million, or $2 million.[87]

---

[80] Telephonic Oral Arg. and Rulings of the Ct. on Pls.' Am. Mot. Expedited Proceedings, 40–41, Dkt. No. 78.

[81] *See Kandell v. Niv*, 2017 WL 4334149 at *12 n.192 (Del. Ch. Sept. 29, 2017).

[82] *See, e.g.*, Verified Class Action Compl. Declaratory and Injunctive Relief, ¶¶ 14–17, 46–52, Dkt. No. 1.

[83] *See id.* ¶¶ 173–74.

[84] *Id.* ¶¶ 187–92

[85] *Id.* ¶ 229.

[86] *See generally* OB.

[87] Tr. Settlement Hearing 102:18–20.

*B. The* Sugarland *Factors in Application*

To assess a claim for attorneys' fees, I must apply the *Sugarland* factors to make an equitable award.[88] These are: "(1) the results achieved; (2) the time and effort of counsel; (3) the relative complexities of the litigation; (4) any contingency factor; and (5) the standing and ability of counsel involved."[89] Historically, the benefit achieved by the Plaintiffs' counsel in the course of the litigation has received the greatest weight.[90] While attorneys' fees are an issue for resolution in the Court's discretion,[91] I look to precedential cases to guide my review.[92]

1. Valuation of the Benefits Achieved

It is necessary to ascertain the benefits achieved before attempting to value the same.

The Plaintiffs seek an award of fees for three benefits: bringing the Merger into compliance with Section 203; the additional (but, per the Plaintiffs, allegedly still inadequate)[93] disclosures GCI made regarding the Merger to its stockholders prior to the vote; and the reduction in the individual Defendants' ultimate voting

---

[88] *See Americas Mining Corp. v. Theriault,* 51 A.3d 1213, 1254 (Del. 2012).
[89] *Id.*
[90] *See id.*
[91] *See, e.g.*, *In re James River Grp., Inc. S'holders Litig.*, 2008 WL 160926, at *2 (Del. Ch. Jan. 8, 2008).
[92] *See, e.g.*, *Olson v. ev3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011) ("Precedent awards from similar cases may be considered for the obvious reason that like cases should be treated alike.").
[93] *See* AB 29.

power that occurred due to the changes in consideration to be paid as a result of the Merger.[94]

The Defendants urge me to award fees with respect to the Section 203 compliance only.[95] They cite *Winthrop v. Central Coal & Coke Corporation*, which states that a fee award is justified where the "'benefit' produced by the defendants' action [is] 'the same or similar [to that] sought by the shareholder's litigation.'"[96] The Defendants read *Winthrop* to require that, to receive fees with respect to an alleged benefit, a plaintiff must have made a specific, now-mooted, claim with respect to each benefit.[97]

This is too narrow a reading of *Winthrop*. In *Winthrop*, the plaintiffs filed a complaint to remove a particular slate of directors.[98] A stockholder written consent was executed that led to the re-election of that exact slate of directors, mooting the plaintiffs' complaint.[99] The plaintiffs sought fees for having worked a corporate benefit, and the Court denied on the basis that the result—reelection of the very directors the plaintiffs sought to remove—was "certainly not the result plaintiffs sought to achieve when they filed [the] action," and therefore the benefit produced was not the same or similar to that sought by the plaintiffs in instigating the

---

[94] *See* OB 2–3.
[95] The Defendants continue to assert that Section 203 did not apply to the Merger. *See* AB 6.
[96] 2000 WL 33173168, at *1 (Del. Ch. Jan. 28, 2000) (internal citation omitted).
[97] *See* AB at 15–16.
[98] *Winthrop*, 2000 WL 33173168, at *1.
[99] *Id.*

litigation.[100]  The Court also briefly analyzed but did not credit an argument by the plaintiffs that insisted the "purpose" of their litigation was to seek the declaration of a legitimate board of directors, instead stating that the Court "perceive[d] the purpose of the litigation differently."[101]

Here, the two extra benefits—additional disclosure and change in voting control—dovetail with the overall "gravamen" of the litigation: "that the Merger consideration for minority stockholders was inadequate while Malone and Maffei received unfair special benefits."[102]  The additional disclosure provided stockholders, whose majority-of-the-minority vote was still being sought, with pertinent information—regarding the process by which Merger consideration was set—for their contemplation before casting their votes.  The change in voting control following the PI Stipulation stripped Malone and Maffei of this unique consideration they were to receive following the Merger.  Thus, the questioned "benefits" are clearly a similar result to that sought by the Plaintiffs in bringing suit, even if they do not precisely correlate to a claim in the First Amended Complaint.

Therefore, I will value the three distinct benefits the Plaintiffs have provided in securing the PI Stipulation: (1) additional public disclosures regarding conflicted

---

[100] *Id.*
[101] *Id.*
[102] Pls.' Reply Br. Further Supp. Their Mot. for Att'ys' Fee Award Benefits Conferred By the Prelim. Inj. Stipulation 10, Dkt. No. 136.

20

individuals; (2) curing of any Section 203 violation; and (3) a reduction in voting control following the consummation of the Merger. I address each in turn.

### a. Valuing the Additional Disclosures

In assessing the value of the disclosure claims, I look to precedents of this Court. In *In re ArthroCare Corporation Stockholder Litigation,* the Court found that a range of $800,000 to $1 million in fees was merited with respect to additional disclosures made regarding the transaction at issue, because the disclosure claims pertained to conflicted financial advisors and financing sources, which made them stronger than the average disclosure claim.[103]

I conclude that an award of $800,000 is appropriate with respect to the disclosure claims. This is indicative of the fact that the disclosure claims in this case were also related to conflicts regarding financial advisors as well as special committee members. I have adjusted to the low end of the scale to reflect the fact that the Plaintiffs still viewed the revised disclosures as insufficient to fully inform GCI stockholders ahead of the vote.[104]

---

[103] *In re ArthroCare Corp. S'holder Litig.*, Cons. C.A. No. 9131-VCL, at 28:4–8 (Del. Ch. Nov. 6, 2014) (TRANSCRIPT).

[104] OB 28 n.74 ("Plaintiffs maintain that the stockholder vote on the Merger was still uninformed even with the Supplemental Disclosures.").

### b. Valuing Compliance with Section 203

The Plaintiffs' Section 203 claim was expressly mooted in connection with the PI Stipulation,[105] given that the changes to the Merger consideration brought the transaction within a statutory safe harbor.[106]

The Defendants argue that, while the Section 203 claims are an "appropriate" basis for a mootness fee,[107] a fee of $1 to 2 million is the most that ought to be awarded.[108] Essentially, the Defendants maintain the position that, despite entry into the PI Stipulation, the Company had previously validly waived the applicability of Section 203 to the Merger, and therefore no true economic benefit was obtained by the Plaintiffs.[109] This reasoning is uncompelling. While the Plaintiffs may not have received a fungible cash payment constituting an economic benefit, ensuring that the merger was statutorily sound is of value to stockholders. Confirming that the Merger is compliant with the statute is itself an important benefit. Further, the compliance ensures that management attention is not diverted in attempting to respond to litigation and inquiries with respect to the alleged violation.

In response, the Plaintiffs point me to *Hawkes v. Bettino*, in which a $3.85 million contested attorneys' fee was awarded in exchange for mooting a Section 203

---

[105] *See* Stip. ¶ 7.
[106] *See* AB 14; *see also* 8 *Del. C.* § 203(c)(3)(v).
[107] AB at 26–27.
[108] *See id.* at 27; *see also* Tr. Settlement Hearing 102:16–20.
[109] *See* AB 17, 28.

violation prior to consummation of a business transaction.[110] I find that a substantial corporate benefit occurred here, and that the fee awarded in *Hawkes* is thus a helpful guidepost.

I note, however, the need to avoid duplicity in measuring an applicable award of fees. The *Hawkes* benefit included supplemental disclosures.[111] I treat disclosure as a separate benefit to be valued, and thus discount the *Hawkes* award by $800,000.[112] This accounts for the additional disclosures regarding the litigation, which were included in the November 24 8-K. Altogether, an award of $3.05 million is appropriate for the mooting of the Section 203 claims.

### c. Valuing the Change in Voting Control

The decrease in the individual Defendants' voting power worked a compensable benefit. In valuing that benefit, the Plaintiffs urge me to consider the Wedge and assign its shrinkage here an express valuation. In support of their position, they proffer the Expert Report of Benjamin Sacks, a financial economist (the "Sacks Report"). The Sacks Report purports to assign a concrete valuation to three separate avenues by which, Sacks argues, the Wedge was decreased in connection with the PI Stipulation: (1) the fact that Malone and Maffei's

---

[110] *See generally Hawkes v. Bettino*, C.A. No. 2020-0360-PAF (Del. Ch. Apr. 1, 2021) (TRANSCRIPT).
[111] *See generally id.*
[112] *See supra* Section II.B.1.a.

23

consideration for the Merger was ultimately converted into non-voting Broadband Series C stock; (2) the fact that Maffei's high-vote Rollover Broadband Series B Options must now, upon exercise, be converted into non-voting Broadband Series C stock; and (3) the termination of the Exchange Agreement, which otherwise would have allowed Malone to retain 49% ownership of Broadband.[113]

To bolster the Sacks Report, the Plaintiffs point to "economists and investor groups," the SEC's Investor Advisory Committee, and statements of this Court in written opinions and oral rulings, supporting the concept that a Wedge can reduce firm value.[114] While these sources support the *concept* of the Wedge, no additional mathematical reasoning has been provided to bolster Sacks's conclusion. I, too, find the concept of the Wedge compelling, but that does not equate with an immediate ability to quantify the concept. The Sacks Report, while providing one theory of quantification, does not persuade me of the appropriateness of the fee award its valuation is purported to justify: $18 to $19 million for this benefit alone.[115]

---

[113] *See* Unsworn Decl. Pursuant to 10 *Del. C.* § 3927 of Andrew E. Blumberg in Supp. of Pls.' Mot. For Att'ys' Fee Award Benefits Conferred by the Prelim. Inj. Stipulation, at Ex. 1., Dkt. No. 125.

[114] *See* OB 31.

[115] I conclude that the Plaintiffs ask me to award $18 to $19 million on strength of the Wedge analysis by way of simple algebra. The Plaintiffs suggest a $22 million award; they do not expressly lay out the formula by which they arrived at this number in their opening brief, but they urge that "The Section 203 and Disclosure Benefits Support a Fee Award of $3 to $4 million." *Id.* at 51.

Instead, I look again to precedent to determine a valuation for the change in voting control secured by the PI Stipulation. *In re Activision* is instructive.[116] That case involved the valuation of three major components: (1) a payment of $275 million to the company; (2) a reduction in two directors' voting power, from 24.9% in the aggregate to 19.9%; and (3) the expansion of the applicable board of directors by two spots to be filled by independent directors.[117] The board of directors at issue also became facially independent as a result of the expansion.[118] The Court treated (1) separately but stated that an award of $5 to 10 million for the reduction of voting power and the addition of two independent directors would be supported by precedent.[119] In support, the Court cited a number of cases, each of which awarded between $5.14 and $8.5 million in fees for a variety of nonmonetary beneficial outcomes.[120]

Precedent further suggests that the addition of a single independent director could itself support an award of $1 million in attorneys' fees.[121] Backing that value

---

[116] *In re Activision Blizzard, Inc. S'holders Litig.*, 124 A.2d 1025 (Del. Ch. 2015).
[117] *Id.* at 1071.
[118] *Id.*
[119] *Id.*
[120] *See id.* at 1071 n.30 (citing *In re Google Inc. Class C S'holder Litig.*, Cons. C.A. No. 7469-CS, at 109 (Del. Ch. Oct. 28, 2013) (TRANSCRIPT), then citing *In re Yahoo! S'holders Litig.*, C.A. 3561-CC, Let. Op. at 1 (Del. Ch. Mar. 6, 2009), and then citing *Minneapolis Firefighters' Relief Assoc. v. Ceridian Corp.*, C.A. No., 2996-CC, Order at 2 (Del. Ch. Mar. 24, 2008)).
[121] *In re Tile Shop Holdings, Inc. S'holder Derivative Litig.*, 10884-VCG, at 42 (Del. Ch. Aug. 23, 2018) (TRANSCRIPT).

25

(unachieved here) out of the *Activision* range suggests that an appropriate range for the reduction in voting control might here fall between $3 and $8 million.

I conclude that $5.5 million, the midpoint of the adjusted range, is an appropriate award for the benefits relating to voting control achieved by the PI Stipulation. Multiple distinguishing facts here inform my conclusion but return it to the mean figure.

First, the *Activision* lead counsel achieved a change with respect to the facial independence of the board, which has not been accomplished here, counseling for a fee in the lower end of the range.

Further, the PI Stipulation prevented *de jure* control from being established, but ultimately Malone and Maffei remain in a position of soft control with respect to the combined company.[122] While this fact does not militate against receiving an award, moderation should guide the quantification of the fee.

On the other hand, the delta between the voting power of Malone and Maffei before and after the PI Stipulation here is roughly fourteen percent,[123] in comparison

---

[122] *See, e.g.*, OB 4 (discussing the "'soft control'" Malone and Maffei had in GCI by virtue of their pre-Merger 35% voting position). If 35% voting control can be viewed as soft control, 47% voting control of the combined company can likewise be considered soft control. *See, e.g.*, *id.* at 2 (identifying Malone and Maffei's voting control of the combined company as "approximately 47%").

[123] *See, e.g.*, *id.* ("[T]he PI Stipulation reduced [Malone and Maffei's] collective voting power on an absolute basis, taking their combined vote from over 61% in the post-Merger company to approximately 47%."); *but see* FAC ¶ 179 ("[T]he two will have 66.6% of the voting power of the combined company taking into account the exercise of Maffei's rolled options and the conversion of Malone's "C" shares as permitted by the Exchange Agreement"). Because Maffei's GCI Series

to the five percent change in *Activision*,[124] suggesting that the fees awarded should perhaps be nudged upwards.

This delta leads the Plaintiffs to suggest that the value of voting control should be subject to a concomitant multiplier (approximately three), and to propose a range of $9 to $24 million in fees associated with the voting control. I cannot agree with this proposition. The stockholders' position was certainly improved, but not so dramatically as to invite an award of fees well exceeding the precedential ranges in *Activision* and the cases to which it cites.

On balance, an award of $5.5 million with respect to the voting control change is appropriate. This sits comfortably within the range promulgated in *Activision* as adjusted for the two additional board seats. It further rewards the Plaintiffs for preventing *de jure* control, but acknowledges the reality that Malone and Maffei likely still maintain soft control over the combined company post-Merger. It also accounts for the fact that a facially independent board of directors was not established here.

---

B Options were not exercised, and because his Rollover Broadband Series B Options must now collapse into non-voting Broadband Series C stock upon exercise, I do not include them in the delta calculation. I do not consider the Exchange Agreement conversion because the agreement has been terminated. Relatedly, the Plaintiffs, in their First Amended Complaint, also urge the conclusion that the potential to achieve 66.6% of the vote was a motivator for Malone and Maffei, as it would allow the two to overcome the supervoting provisions in Broadband's certificate of incorporation with respect to future transactions. *See id.* ¶ 203. Because this change was speculative in nature, given that it hinged on Maffei's decision as to whether to exercise his Rollover Broadband Series B Options, I do not credit it in the award here.

[124] *Activision*, 124 A.3d at 1071.

In sum, then, an appropriate fee for the benefit acquired for the corporation is $9.35 million in total: $3.05 million for resolution of the Section 203 claim; $800,000 for the improved disclosures pertaining to conflicted directors, special committee members, and financial advisors; and $5.5 million accorded to the change in voting control.

### 2. The Remaining *Sugarland* Factors and the Lodestar Cross-Check

The remainder of the *Sugarland* factors are comparatively straightforward to address. The case was taken by the Plaintiffs' counsel on a contingent basis, and the experience, skill, standing and ability of both the Plaintiffs' and the Defendants' counsel are well known to this Court to be exemplary. The litigation here was complex, not only in the sense that the underlying transaction was complex, but also logistically with respect to the expedited timeline seeking relief in advance of the stockholder vote.

*Sugarland* also highlights that the time and effort of counsel must be recognized. Given the course of expedited discovery, the Plaintiffs' counsel received almost eleven thousand documents and took five depositions, while preparing briefing and argument *and* also negotiating the PI Stipulation in parallel. Prior to the PI Stipulation, the Plaintiffs' counsel had devoted over 2,700 hours to this matter, which such total is truncated due to both the expedited schedule and the

determination that it was appropriate to enter into the PI Stipulation ahead of additional depositions, briefing, and argument.

To prevent granting of windfall awards, this Court has historically considered hours worked as a "crosscheck."[125]  The Plaintiffs' counsel reported in their Opening Brief that they worked 2,716.4 hours prior to the PI Stipulation, which they value at approximately $1.6 million.[126]  Assuming an award of $9.35 million, this implies an hourly rate of $3,442.06.  In light of the contingent nature of the litigation, I find this is within the range of precedents and confirms the fee award granted here is not a windfall.

In sum, each of the *Sugarland* factors weighs in favor of an award of attorneys' fees to the Plaintiffs' counsel of $9.35 million, exclusive of the settlement fee award.

## III. CONCLUSION

The Plaintiffs' Motion for Attorneys' Fees is GRANTED in the amount of $9,350,000.  An appropriate Order is attached.

---

[125] *Olson v. ev3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011).
[126] OB 57.

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| HOLLYWOOD FIREFIGHTERS' PENSION FUND and SHEET METAL WORKERS' LOCAL UNION NO. 80 PENSION TRUST FUND, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>   v.<br><br>JOHN C. MALONE, GREGORY B. MAFFEI, GREGG L. ENGLES, RONALD A. DUNCAN, DONNE F. FISHER, and RICHARD R. GREEN,<br><br>                    Defendants. | C.A. No. 2020-0880-SG |

## ORDER GRANTING PLAINTIFFS' MOTION FOR ATTORNEYS' FEE AWARD FOR BENEFITS CONFERRED BY THE PRELIMINARY INJUNCTION STIPULATION

WHEREAS, Plaintiffs have moved for an Order for an award of attorneys' fees for benefits conferred by the Preliminary Injunction Stipulation;

IT IS HEREBY ORDERED this 8th day of November, 2021 that:

1.    Plaintiffs' Counsel are awarded $9,350,000 for benefits conferred by the Preliminary Injunction Stipulation; and

2.    Such sum shall be paid within five (5) days of entry of this Order.

                                                  
Vice Chancellor Glasscock III